540 F.2d 777
 Harold SOLOMON, as Personal Representative of the Estate of
Jerome E. Levin, Deceased, and Leatrice D. Levin, his wife,
Deceased, and as Guardian of the Person and Property of
Ellynn Joyce Levin, Jeffrey Allan Levin and Lawrence David
Levin, minors, Plaintiffs-Appellees-Cross Appellants,
v.
Stanley WARREN, as Executor of the Estate of Paul Warren,
Deceased, andInsurance Company of North America, a
Pennsylvania
Corporation,Defendants-
Appellants-Cross Appellees.
 No. 74-2670.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 15, 1976.
 
 George O. Mitchell, Mallory H. Horton, Miami, Fla., Howard M. Neu, No. Miami, Fla., for Stanley Warren.
 James S. Usich, Coral Gables, Fla., for Ins. Co. of N. America.
 Spence, Payne & Masington, R. W. Payne, Jr., Robert L. Parks, Robert Orseck, Miami, Fla., James V. Dolan, Ft. Lauderdale, Fla., for Horizon Hunters.
 John D. Kruse, Ft. Lauderdale, Fla., for Ranger Ins.
 Appeals from the United States District Court for the Southern District of Florida.
 Before GEWIN, SIMPSON and GEE, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 On July 23, 1971, a Cessna 337 Super Skymaster aircraft, piloted by Paul Warren (Warren) with his wife Dolores and Jerome E. Levin and Leatrice D. Levin (the Levins) as passengers, disappeared and was presumed lost at sea in the Caribbean on a flight from the Dr. Albert Plesman Airport, Willemstad, Curacao, Netherlands Antilles, to the Seawall International Airport, Barbados, West Indies. As a result the plaintiff-appellee, Harold Solomon, in the dual capacity of personal representative of the Levins' estates, and as guardian of the Levins' three children, whose respective names and ages at the time of the Levins' deaths were Ellynn 20, Jeffrey 19, and Lawrence 16, brought this action against the defendants-appellants, Stanley Warren, as executor of the estate of Paul Warren, and the Insurance Company of North America (INA), as insurer of Paul Warren under an Aircraft Operator's Liability Policy.[1] The complaint asked damages for the wrongful deaths of the Levins pursuant to the Death on the High Seas Act, Title 46, U.S.C., Section 761,[2] et seq., (DOHSA) and recovery for the Levins' mental pain and grief sustained prior to their death, pursuant to the Florida Survival Statute, Section 46.021, Fla.Stat. (1971). Sitting as an admiralty court without a jury, pursuant to Rule 9(h), F.R.Civ.P. and DOHSA, and with pendent jurisdiction over the survival action, the district court, after a trial, held that Warren was negligent in four respects in his operation of the missing aircraft, and that this negligence was "a direct and proximate result of the (Levins') deaths."[3] The district court awarded total damages of $714,998.00 for all claims of the Levin children as statutory beneficiaries under DOHSA, and $10,000 to each of the Levins' estates on the pendent survival claim for the conscious pain and suffering of the Levins prior to their deaths. See note 10 infra. In accordance with its findings of fact and conclusions of law the district court entered a final judgment for the plaintiff-appellee assessing $434,998.00 of the damage award against the estate of Paul Warren, and assessing the remaining $300,000.00 of the damage award (the amount of its policy limits) against INA. Subsequent to the entry of this judgment the district court denied the plaintiff-appellee's motions for prejudgment interest and for the award of attorneys' fees against INA, pursuant to Fla.Stat. Section 627.428.
 
 
 2
 On appeal the defendants-appellants contend that the district court erred in the following respects: (i) as a matter of law in finding that Paul Warren was negligent in his operation of the aircraft; (ii) in admitting into evidence over the appellants' objections the transcription of the final radio communication purportedly between Warren and the Seawall Airport Control Tower; and (iii) both as a matter of law and fact in the award of various items of damages. The plaintiff-appellee cross appeals from the district court's denial of his motions for prejudgment interest and attorneys' fees.
 
 
 3
 We affirm in part and reverse in part.
 
 THE FACTS
 
 4
 The Warrens and the Levins left Miami, Florida, on July 14, 1971, for a vacation trip to various Caribbean islands, traveling in a Cessna 337 Skymaster Aircraft, bearing F.A.A. registration number N5310S (the Cessna or N5310S). Paul Warren was the pilot. He had rented the aircraft from Horizon Hunters, Inc., a flying club, of which he was a member. Prior to the departure the Cessna had undergone hundred-hour and annual inspections, a part of which included checking the fuel tanks, hoses, lines and gauges, and a certification by a mechanic that it was airworthy. According to the Cessna Service Manual this particular model is equipped with two main and two auxiliary fuel tanks, with a combined total usable fuel capacity of 128 gallons.
 
 
 5
 On July 23, 1971, Paul Warren filed with the Curacao Air Traffic Services a Visual Flight Rule Plan (VFR) for an anticipated flight on that date from Willemstad, Curacao, in the Netherlands Antilles, to Seawall Airport, Bridgetown, Barbados, via air routes 7 and 9, a distance of approximately 607 nautical miles, or 690 statute miles. The direction of flight was slightly north of east. The VFR further indicated a proposed cruising altitude of 9500 feet, an estimated speed of 140 knots, with 20 knot headwinds from the east, and an estimated usable fuel supply endurance time of 6 hours and 15 minutes. Warren estimated his flight time from Curacao to Barbados at 4 hours and 45 minutes. Weather information available to Warren indicated that weather conditions along the planned flight route included scattered cumulus clouds and showers with bases of 1500 feet and tops of 16,000 feet, and isolated cumulonimbus clouds and thunderstorms with bases at 500 feet and tops ranging from 30,000 to 35,000 feet. The VFR designated St. Georges, Grenada, as an alternate destination.
 
 
 6
 At 12:59 Greenwich Mean Time (G.M.T.) (8:59 Atlantic Standard Time or AST) the Cessna left Willemstad Airport piloted by Warren with Mrs. Warren and the Levins as passengers. Twenty-one minutes later the aircraft returned to the Willemstad Airport, and Warren requested that the plane's fuel tanks be "topped off". Although the Cessna had been refueled with approximately 32 gallons upon its arrival at Willemstad on July 20, 1971, an additional 37 gallons of fuel were taken aboard at this time. With a supposed capacity load of 128 gallons of usable fuel aboard, Warren and his passengers in the Cessna again left Willemstad at 13:49 G.M.T. for the 690 statute mile flight to Barbados.
 
 
 7
 En route to Barbados Warren contacted the air control tower in Grenada, 155 statute miles from Barbados, by radio, at approximately 18:19 G.M.T., 4 hours and 30 minutes after departure from Willemstad. In this radio communication Warren stated that the aircraft was at 11,500 feet, descending to 10,500 feet, and proceeding to Barbados.
 
 
 8
 At 19:31 G.M.T., 5 hours and 42 minutes after the second departure from Willemstad and 1 hour and 12 minutes after the radio contact with Grenada air control, the final radio communication from the Cessna was received by Seawall Airport Traffic Control on Barbados. A transcript of a tape recording of this communication made by Seawall Traffic Control, admitted into evidence in the district court over appellants' objections, quotes Warren as indicating that the fuel gauges on the aircraft were reading empty, and that the front main fuel tank had burned faster than Warren had anticipated. Further, Warren informed Seawall Control that he would attempt to ditch the aircraft near a merchant vessel, which he said had three large square frames on its deck and a "K" on its funnel. See note 5, infra, and accompanying text.
 
 
 9
 Following the receipt of this radio communication, Seawall Traffic Control contacted all merchant shipping in the area, and identified the vessel described by Warren as the Alconia, which was located approximately 40 miles west southwest of Barbados. Despite an extensive search of the area no sign of the aircraft or its occupants was ever found. They are presumed lost at sea.
 
 
 10
 ADMISSIBILITY OF TRANSCRIPT OF FINAL RADIO COMMUNICATION
 
 BETWEEN WARREN AND BARBADOS TOWER
 
 11
 Pursuant to the Federal Business Records Act, Title 28, U.S.C., Section 1732(a),[4] the district court admitted into evidence, over appellants' objections, a transcription of a tape recording made by Air Traffic Control, Barbados, of the final radio communication between Warren and the Barbados Tower.[5] This transcript was appended to the deposition of the Senior Control Officer at Seawall Airport, who authenticated it as an accurate transcription of a tape recording of the communication between Warren and the tower, as contained in a "resume" of the transmissions between the Warren aircraft and the tower. Deposition of Clyde Outram, pp. 6-8. The control officer further testified that the resume was compiled by Barbados air control as part of its official records. Id.
 
 
 12
 The appellants object to the admissibility of the transcription because of the testimony of the control officer that a controller on another aircraft, 8P-LAC, served as a relay and assisted Barbados Tower in communicating with the Cessna piloted by Warren. On this basis the appellants, while not challenging the accuracy of the transcription, assert that because the statements attributed to Warren on the tape recording and the transcription are in fact the words of the relay controller on the intermediary aircraft, the transcription and the actual tape are inadmissible hearsay.
 
 
 13
 Appellants' contention lacks merit, since neither the transcription of the tape recording nor the deposition of the control officer support the proposition that Warren's communications to the control tower were relayed by the intermediary aircraft. Rather, the transcription states that the intermediary aircraft was used only "to relay messages to N5310S as he was too low to receive . . . transmissions" from Barbados Tower. See note 5, supra (emphasis added). Further, the transcript attributes each remark relayed by the intermediary aircraft to 8P-LAC, and each statement attributed to 8P-LAC is an inquiry to the Cessna piloted by Warren. None of the remarks or responses from the Cessna are indicated on the transcription as having been relayed by 8P-LAC, instead each transmission from the Cessna is indicated as a direct quote from the pilot, Warren, of that aircraft. Likewise, nowhere in the deposition of the Senior Control Officer is there any indication that the statements attributed to Warren on the transcript were relayed to the tower by the controller on 8P-LAC, the intermediary aircraft.
 
 
 14
 For this reason, we find without any basis in fact the appellants' contention that the statements attributed to Warren on the transcription are inadmissible hearsay. The district court did not err in admitting the transcription into evidence under the Federal Business Records Act.
 
 LIABILITY
 
 15
 At the trial plaintiff-appellee set out to prove that Paul Warren negligently operated the Cessna aircraft piloted by him (1) by failing to provide an adequate fuel reserve for the proposed flight, (2) by failing to compute his fuel consumption and land speed en route to Barbados, and (3) by over-flying his alternate destination, Grenada, at a time when it should have been apparent to him that he had insufficient fuel aboard the Cessna to reach Barbados. Three expert witnesses for the plaintiff testified that Warren committed pilot error in planning the flight and in his operation of the aircraft on July 23, 1971. The testimony of these experts was based mainly on the VFR filed by Warren with the Curacao Air Traffic Services, and on the radio communications between Warren and the control towers in Grenada and Barbados.
 
 
 16
 On the other hand the appellant maintained that Warren was not negligent in his operation of the aircraft, and offered expert testimony that the fuel venting system on the type of Cessna aircraft flown by Warren was negligently designed so as to cause a partial collapse of the aircraft's main fuel tanks which would result in those tanks containing less than a full complement of usable fuel.[6]
 
 
 17
 The district court accepted as a probability that the fuel tanks of the Cessna aircraft N5310S piloted by Warren had collapsed on a prior flight, but nevertheless found that Warren was negligent in the manner in which he operated the aircraft on July 23, 1971, in the following four respects:
 
 
 18
 (a) in failing to provide in planning the trip for an adequate fuel reserve for a flight over water;(b) in failing to properly record and compute his fuel usage throughout the trip, taking into consideration his actual overall ground speed;
 
 
 19
 (c) in over-flying Grenada, his alternate destination, at a time when he should have known that the aircraft did not have sufficient fuel to reach Barbados;
 
 
 20
 (d) in failing to maintain his altitude for as long as possible after he became aware that his fuel gauges indicated that the fuel tanks were empty and attempting to proceed to either Barbados or Grenada by continuing to operate the aircraft without regard to the reading of the fuel gauge, thereby taking advantage of the time and distance available through the glide ratio characteristics of the aircraft.
 
 
 21
 Based on these findings the district court concluded that Warren's negligence was "a direct and proximate result of the deaths of" the Levins.[7] See note 3, supra.
 
 
 22
 On appeal the appellants contend that the appellee did not establish by a preponderance of the evidence that Paul Warren was negligent in the planning of the trip and in the operation of the aircraft on July 23, 1971, and that Warren's negligence proximately caused the Levins' deaths. The argument goes that even when viewed in a light most favorable to the appellee, the evidence at trial shows that there are two equally acceptable theories of the cause of the fatal crash: (1) the negligence of Warren and (2) the defect in the main fuel tank venting system in this model of aircraft. The appellants assert therefore that the appellee did not carry his burden of proof and that the district court erred in finding that Warren's negligence was a proximate cause of the loss of the aircraft and the deaths of the Levins.
 
 
 23
 This argument misconceives our appellate function. Our review is governed by the oft-quoted holding of McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, that a Court of Appeals may not set aside the judgment of a trial court sitting in admiralty without a jury unless it is clearly erroneous. "No greater scope of review is exercised by the appellate tribunals in admiralty than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A." Id. at 20, 75 S.Ct. at 8, 99 L.Ed. at 24. See also Caradelis v. Refineria Panama, S.A., 5 Cir. 1967, 384 F.2d 589, 593-94; Rule 52(a), F.R.Civ.P. Thus, where the conclusions of the trial judge may reasonably be inferred from the record as a whole those conclusions will not be set aside on appeal, even though "conflicting inferences of equal reasonableness may be drawn from . . . the same body of evidence". Skidmore v. Grueninger, 5 Cir. 1975, 506 F.2d 716, 724, citing McAllister v. United States, supra ; Movible Offshore, Inc. v. M/V Wilken A. Falgout, 5 Cir. 1973, 471 F.2d 268, 271.[8] Here, after careful scrutiny of the record, and viewing the findings of the district court under the rule of McAllister, we find sufficient evidentiary support for that court's conclusions as to liability. Cf. Krause v. Sud-Aviation, Societe Nationale de Constructions Aeronautiques, 2 Cir. 1969, 413 F.2d 428.
 
 
 24
 The plaintiff adduced convincing evidence that Warren negligently operated the Cessna even accepting as true that one or more of the main fuel tanks of the aircraft did collapse due to the design defect. Evidence supporting the theory that design defects in the fuel venting system may have caused the aircraft to have less than a full complement of fuel aboard at departure came largely from appellants' two expert witnesses, McWhorter and Loth. McWhorter testified, based on his investigations of other crashes of Cessna 337 Super Skymasters of the same vintage as that flown by Warren, that because of the location of the fuel venting system for the main fuel tanks and because of pressure in flight on the wings of the aircraft the main fuel tanks on the same model of aircraft had suffered partial collapse. Because of the location of the fuel tanks inside the wing, the partial collapse of either of the main fuel tanks due to this design defect could result in the aircraft having less than a full load of fuel on board, without any knowledge on the pilot's part. McWhorter further testified that another potential effect of a partial fuel tank collapse would be fuel starvation of the aircraft's engines. Finally, McWhorter offered the expert opinion, based on Warren's return to Willemstad airport and his request to "top off" his fuel tanks, and also on Warren's remarks in the final radio communication with Barbados Tower, note 5, supra, that at least the left main fuel tank on the Cessna flown by Warren was partially collapsed.
 
 
 25
 McWhorter conceded on cross-examination that if either of the main fuel tanks on the Cessna were collapsed on July 23, 1971, the collapse occurred on a prior flight, inasmuch as tank collapse occurs only when the tanks are less than full, and collapse on a particular flight cannot cause loss of fuel during that flight. The time span for possible collapse was further circumscribed by the testimony of the mechanic who inspected the Cessna immediately preceding its departure from Miami on July 14, 1971. This testimony was to the effect that as a part of that inspection the main fuel tanks enclosed in the wings were inspected and showed no signs of collapse. If the fuel tanks on the Cessna in fact collapsed because of the design defect in the fuel venting system, that collapse necessarily occurred between the time of the aircraft's departure from Miami on July 14 and its arrival in Curacao on July 20, 1971.
 
 
 26
 The appellants' fuel tank collapse theory itself collapses in light of the testimony of the appellee's three expert witnesses. They expressed the opinion that even assuming there was a full complement of usable fuel on board the aircraft, that based upon Warren's actual flight time he had not provided for a sufficient fuel reserve. These experts agreed that on a flight over water a reasonably prudent pilot in planning the flight and in computing his fuel endurance time enroute would allow for sufficient fuel to reach his primary destination, and still have in reserve sufficient fuel not only to return to his alternate destination, but also to have remaining fuel sufficient for between 30 minutes and an hour and 30 minutes of flying time. As we have noted, Warren's flight plan filed at Willemstad, Curacao, estimated a fuel endurance time of 6 hours and 15 minutes and a flight time to Barbados of 4 hours and 45 minutes. Yet, 4 hours and 30 minutes after the aircraft departed Willemstad it had reached only the vicinity of Grenada, its alternate destination, and was still, therefore, at least an hour and 20 minutes flying time away from its destination at Barbados. Further, while the flight plan estimated an air speed enroute of 140 knots, when it reached Grenada the aircraft's actual average air speed was only 100 knots. This had still further decreased to 97 knots at the time of the final communication with Barbados Tower. On the basis of these figures the appellee's experts were unanimous that there was inadequate fuel reserve for the flight even assuming that the tanks contained a full load of fuel, and opined further that a reasonably prudent pilot would have calculated his endurance time enroute and would have landed at Grenada. Appellants' expert McWhorter agreed on cross-examination that based on the above calculations his standards for reserve fuel time were not met when the aircraft reached the vicinity of Grenada.
 
 
 27
 McWhorter testified also that in his opinion there were only four possible explanations for the variances between the flight plan's estimated flight time and air speed and the Cessna's actual flight time and air speed: (i) that severe headwinds of 40 knots were encountered; (ii) that because of the aircraft's altitude limitations Warren was required to fly around cumulus cloud formations on the flight route; (iii) that the aircraft had a serious malfunction requiring Warren to deviate from the normal cruising altitude; or (iv) that Warren had done in excess of 110 statute miles of sight-seeing between Curacao and Grenada. If any one, or a combination of these four events had occurred, a prudent pilot would have considered the effect in his inflight fuel endurance computations. The expert witness McWhorter also conceded on cross-examination that, conservatively estimating 25 to 35 gallons of fuel capacity lost as a result of a partial tank collapse and considering the actual flight time to Grenada, under normal conditions the aircraft's fuel supply would have been exhausted by the time it reached Grenada.
 
 
 28
 Finally, in response to questions by the court, McWhorter testified that a reasonably prudent pilot confronted with the situation indicated by Warren in his final radio communication with Barbados Tower would not have ditched the aircraft. Based on the absence in the transcription of the final radio communication received from Warren of any indication that the engines on the aircraft had at that time quit, McWhorter stated that Warren should have disregarded the fuel gauges, computed the aircraft's fuel endurance time assuming that the fuel tanks were full on take-off, and proceeded to the nearest land mass or airport. Assuming that Warren was cruising at 10,500 feet as he stated in his communication with the Grenada Tower, McWhorter testified that Warren could have glided 25 miles at a minimum after the aircraft's engines failed.
 
 
 29
 The evidence we have outlined, together with the other evidence adduced at the trial and the reasonable inferences from it by the district court, clearly support each finding of negligence made by the district court. They were not clearly erroneous and we may not set them aside. McAllister v. United States, supra ; Rule 52(a), F.R.Civ.P.
 
 DAMAGES
 
 30
 Having determined that Paul Warren's negligence in the planning of the trip and in the operation of the aircraft was a proximate cause of the Levins' deaths, the district court awarded the appellee in his representative capacity a total of $734,998.00 in damages on all causes of action. Of the total damage award, $10,000 was awarded to each of the Levins' estates for conscious pain and suffering for the pendent cause of action under the Florida Survival Statute. The remaining $714,998.00 was awarded to the appellee in his capacity as personal representative of the Levins' estates for the use and benefit of the Levins' three children, Ellynn, Jeffrey, and Lawrence, pursuant to Section 2 of DOHSA, Title 46, U.S.C., Section 762,[9] to compensate for the "pecuniary loss" which they sustained as a result of the deaths of their parents. The measure of recovery under Section 2 of DOHSA is the actual pecuniary benefits that the decedent's beneficiaries could reasonably have expected to receive from the continued life of the decedent. See, e. g., Dugas v. National Aircraft Corporation, 3 Cir. 1971, 438 F.2d 1386, 1392; National Airlines, Inc. v. Stiles, 5 Cir. 1959, 268 F.2d 400, cert. denied 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121; The S. S. Black Gull, 2 Cir. 1937, 90 F.2d 619, 620, cert. denied, 302 U.S. 728, 58 S.Ct. 50, 82 L.Ed. 562; First National Bank in Greenwich v. National Airlines, Inc., S.D.N.Y.1958, 171 F.Supp. 528, aff'd 2 Cir., 288 F.2d 621, cert. denied sub nom, Kessler v. National Airlines, Inc., 1961, 368 U.S. 859, 82 S.Ct. 102, 7 L.Ed.2d 57.
 
 
 31
 As required by Section 2 of DOHSA, the court below apportioned the award of damages among the Levin children, as statutory beneficiaries, as follows: (i) for the use and benefit of Ellynn Joyce Levin the sum of $119,833 for the death of her father, and the sum of $110,833 for the death of her mother; (ii) for the use and benefit of Jeffrey Allan Levin the sum of $122,333 for the death of his father, and the sum of $112,333 for the death of his mother; (iii) for the use and benefit of Lawrence David Levin the sum of $131,333 for the death of his father, and $118,333 for the death of his mother. In an explanatory note attached to its findings of fact and conclusions of law, the district court itemized the damages awarded for various pecuniary losses and explained the basis for its computations.[10] For purposes of this appeal we need consider only the following items of damages:
 
 
 32
 (a) Eight thousand dollars to each child for the loss of schooling or formal education at college level;
 
 
 33
 (b) Twenty-five thousand dollars to each child for the death of each parent for the loss of parental guidance and training after reaching majority;
 
 
 34
 (c) The total combined loss of inheritance of $499,998;
 
 
 35
 (d) Ten Thousand dollars to each of the Levins' estates under the Florida Survival Statute, Section 46.021, Fla.Stat. (1971), for conscious pain and suffering experienced prior to death by the decedents.
 
 
 36
 The appellants contend that the law and the evidence do not support the award below of the enumerated items of damages.
 
 
 37
 On the cross-appeal the appellee contends that the district court erred in not awarding pre-judgment interest on the damages awarded on the DOHSA cause of action and in denying his motion for attorneys' fees.
 
 
 38
 We consider separately each contested item of damages and the claim for
 
 
 39
 pre-judgment and attorneys' fees interest. AWARD OF $25,000
 
 
 40
 TO EACH CHILD FOR DEATH OF EACH PARENT FOR THE
 
 LOSS OF PARENTAL GUIDANCE AND TRAINING
 AFTER REACHING MAJORITY
 
 41
 Without serious dispute, children may suffer a pecuniary deprivation, apart from the loss of support and financial contributions, from the death of their parents in the loss of parental guidance and training, commonly identified as the loss of nurture. See Speiser, Recovery for Wrongful Death 2d, Section 3:47 (1975); 2 Harper & James, The Law of Torts, Section 25.14 (1956); McCormick, Damages, Section 99, at 349 (1935). Although this item of damages cannot be computed with any degree of mathematical certainty, the courts in applying the strictured pecuniary loss test of DOHSA have held that the loss to children of the nurture, instruction, and physical, intellectual, and moral training that they would have received from their parents, but for the parent's wrongful death, may constitute a pecuniary loss and, as such may be a recoverable element of damages under DOHSA.[11] See Moore-McCormack Lines, Inc. v. Richardson, 2 Cir. 1961, 295 F.2d 583, 593 n. 9a, cert. denied 1962, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526; Higginbotham v. Mobil Oil Corporation, W.D.La.1973, 360 F.Supp. 1140, 1149-50; Petition of Risdal & Anderson, Inc., D.Mass.1968, 291 F.Supp. 353, 358. Cf. Michigan Central R. Co. v. Vreeland, 1913, 227 U.S. 59, 73, 33 S.Ct. 192, 197, 57 L.Ed. 417, 423.[12] Under DOHSA, however, the wrongful death of a parent standing alone is an insufficient predicate to support recovery by a child of the loss of parental nurture, and in order to recover this item of damages the evidence must show that the deceased parent was fit to furnish such training and that training and guidance had actually been rendered by the parent during his or her lifetime to their children. See Dugas v. National Aircraft Corporation, supra, 438 F.2d at 1395; Moore-McCormack Lines, Inc. v. Richardson, supra, 295 F.2d at 588. The record below supports the trial court's finding that during their lifetime the Levins "provided each of (their) children with parental guidance and normal training; and, that by reason of (the Levins') death(s), each of such children . . . have lost the parental guidance and moral training they would have otherwise received from their (parents)." The appellants do not question the district court's award of damages for loss of parental guidance and training by the Levin children during their respective minorities, see note 10 supra. But the district court's award of damages to each of the children for loss of training and guidance after reaching majority is asserted to be contrary to the pecuniary loss test of DOHSA.
 
 
 42
 Our study of the cases in which loss of parental guidance and training of a child has been allowed as a recoverable item of damages under DOHSA has not brought to light any case where such damages were awarded to a surviving child for the period after reaching majority. See Noel v. United Aircraft Corporation, supra, 342 F.2d at 239; Moore-McCormack Lines, Inc. v. Richardson, supra, 295 F.2d at 588; Higginbotham v. Mobil Oil Corporation, supra, 360 F.Supp. at 1149-50; Mascuilli v. United States, E.D.Pa.1972, 343 F.Supp. 439, 442-43, rev'd on other grounds, 3 Cir. 1973, 483 F.2d 81; Petition of Canal Barge Co., N.D.Miss.1971, 323 F.Supp. 805, 814, aff'd in part and rev'd in part on other grounds sub nom, Petition of M/V Elaine Jones, 5 Cir. 1973, 480 F.2d 11; Soileau v. Nicklos Drilling Co., W.D.La.1969, 302 F.Supp. 119, 127; Petition of Risdal & Anderson, Inc., supra, 291 F.Supp. at 358; First National Bank in Greenwich v. National Airlines, Inc., supra, 171 F.Supp. at 537-38, aff'd 288 F.2d at 624; In re Southern Steamship Company's Petition, D.Del.1955, 135 F.Supp. 358, 361-62.[13] In First National Bank in Greenwich v. National Airlines, Inc., supra, the Second Circuit considered whether an adult child may recover for the loss of parental guidance under the pecuniary loss standard of DOHSA, and denied such recovery on the facts of that case, stating:
 
 
 43
 "Whatever may be the rule for minor children, it is clear that those who have reached their majority must be very specific to show that their parents' guidance had a pecuniary value beyond the irreplaceable values of companionship and affection."
 
 
 44
 288 F.2d at 624. This accords with the implicit justification for allowing recovery of this item of damages under the narrow pecuniary loss standard of DOHSA. The intellectual, moral, and physical training which a child receives from a careful and competent parent during the formative years of its minority should result in preparing the child to make a life and living of his own. Cf. Michigan Central R. Co. v. Vreeland, supra; Tilley v. Hudson R. R. Co., N.Y.1899, 29 N.Y. 252; McKay v. New England Dredging Co., 1899, 92 Me. 454, 43 A. 29. The opportunity and necessity for such training and guidance diminish in the normal child as he reaches majority and leaves his parents' roof for college or for his own separate home. See Petition of Risdal & Anderson, Inc., supra, 291 F.Supp. at 358, citing Meehan v. Central Railroad Company of New Jersey, S.D.N.Y.1960, 181 F.Supp. 594, 622 n. 4. A definite age, applicable in all circumstances, when the parent's nurture, instruction, and training diminishes to the extent that it ceases to have a definite practical and financial value to a child is not possible of ascertainment. Hence the facts and circumstances of each particular case control not only the legal basis for such damages but their quantum as well.
 
 
 45
 There is no specific showing in this record to support an award of damages to any of the Levin children for the loss of their parents' nurture and training after majority. At the time of the Levins' deaths Ellynn was 20 years old, and had only recently returned home after working in California for two years in order to attend a local college. Jeffrey, 19 at the time of the accident, had by then graduated from high school. He attended a local junior college for approximately two years following his parents' deaths. Subsequently, Jeffrey left home to work in another section of the country. Lawrence, who was 16 when his parents died, graduated from high school the year after the accident, and worked for two years prior to enrolling in college. Although all three of the children testified that they relied on the counsel and advice of their parents, there was no specific showing that these children have or will suffer during their majorities from the loss of their parents' nurture beyond "the irreplaceable values of companionship and affection." First National Bank in Greenwich v. National Airlines, Inc., supra. Therefore, we hold that the district court erred in awarding damages to each child for post majority guidance and training from each parent.
 
 
 46
 AWARD OF $499,998 FOR TOTAL COMBINED LOSS OF INHERITANCE
 
 
 47
 In the explanatory note attached to its findings of fact and conclusions of law the district court stated:
 
 
 48
 "In awarding damages for lost inheritance to each of the children, the Court has carefully reviewed all of the evidence and, recognizing the inherent difficulty in predicting future gains or losses, is absolutely convinced that had these deceased not met their untimely and premature death their estates would have been considerable and, at a minimum, at least four or five times the assets reflected by the estate inventories filed herein. Discounting increased salary to JEROME E. LEVIN, recognizing that much of these sums would have been used for family living expenses, for further education of each of the children and, possibly, more pleasurable endeavors for all members of this family, it is abundantly clear that both JEROME E. LEVIN and LEATRICE D. LEVIN had learned the value of an established pattern of savings and investment in real estate and similar properties. In an effort to be completely fair to all concerned and using what the Court considers an absolute minimum figure, the computations contained herein are based upon a total combine (sic) loss of inheritance of $500,000.00. . . . The Court is convinced that both Mr. and Mrs. Levin were convinced of the value of systematic investment in real property and that this program would have continued throughout their natural lives."
 
 
 49
 The appellants assert that the district court erred in the award of this item of damages both as a matter of law and as to quantum. The actual total was $499,998, Note 10, supra.
 
 
 50
 In National Airlines, Inc. v. Stiles, supra, this court held that the probability of a widow's inheritance of accumulations to her deceased husband's estate was a properly considered item of pecuniary loss under DOHSA. Accord Cox v. Northwest Airlines, Inc., 7 Cir. 1967, 379 F.2d 893, cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836; Blumenthal v. United States, E.D.Pa.1960, 189 F.Supp. 439, 449, aff'd, 3 Cir. 1962, 306 F.2d 16.[14] Appellants, however, argue that the teachings of Stiles is not applicable to this appeal because the husband's moral and legal duty the latter inescapable to leave a sizable part of his estate to his wife is absent in the parent-child relationship. This argument would have us ignore the explicit basis for the holding in Stiles that where a widow does in fact inherit her spouse's estate on his untimely death it is probable that she would have continued to be the object of his bounty if he had lived, and she would likely have inherited any additional accumulations to his estate. Similar reasoning applies to a couple's children, who have a reasonable expectation that they would have been the beneficiaries of any prospective accumulations to the estates of their parents as the natural objects of their bounty. As one noted authority has stated:
 
 
 51
 "Where the evidence shows that it is probable that the decedent, but for his death would have accumulated property, which if he had died intestate, would have been inherited by the beneficiaries of the action, these facts constitute such a reasonable expectation of pecuniary benefit as to authorize a recovery for damages for its loss."
 
 
 52
 Tiffany, Death by Wrongful Act, 378 (2d ed. 1913).[15] See also McCormick, Damages, § 99, at 350 (1935); Sedgwick, Measure of Damages, 1109 (9th ed. 1920); 5 Sutherland, Damages, 4873 (4th ed. 1916). An even stronger showing of a reasonable expectation of pecuniary benefit is present in a situation such as prevails in this case, where claimants-beneficiaries are actually the sole legatees under the decedent's will,[16] as well as the sole persons entitled to take as heirs and beneficiaries under the laws governing intestate succession.[17] See Speiser, Recovery for Wrongful Death 2d, § 3:39, at 279 (1975); McCormack, Damages, at 350. Additionally, friends, relatives and business associates of the Levins testified that the Levins had a close relationship with their children, and had expressed concern as to their childrens' future financial welfare. On the facts before us on this appeal, we find that no error occurred when the trial court considered the losses of inheritance by the Levin children as recoverable items of pecuniary loss under DOHSA.
 
 
 53
 Having approved the decision of the district court that loss of inheritance was a legally recoverable item of damage as to each Levin child, we must next decide whether the amounts awarded below in this connection were excessive under the evidence. At the time of the accident Mr. and Mrs. Levin were each 44 years of age, with average life expectancies for that age of 27.7 years and 33.4 years respectively.[18] In accountings filed in the probate court in December 1973, Mr. Levin's estate was valued at approximately $139,147, and Mrs. Levin's estate was valued at approximately $133,036. Over one-half of the assets in the Levins' combined estates consisted of rental real estate investments, mortgages and mutual funds. The remainder of the assets of the estates included a private residence, personal property, proceeds from life insurance policies, and cash. The federal income tax returns of the Levins from 1965 through 1971 were put in evidence, and showed substantial investment income during those years. Additionally, a business partner of Mr. Levin testified that at the time of the Levins' deaths, Jerome Levin was planning further investments in two real estate projects. This was a type of investment which had proved profitable to him in the past.
 
 
 54
 The work history of Jerome Levin was traced by the appellee, and his earnings from salary and wages were shown by the income tax returns in evidence for the years 1965 through 1971. A co-worker of Jerome Levin testified that the decedent father had worked for a furniture manufacturer since 1957, beginning as a salesman and advancing through various promotions culminating shortly before his death in his promotion to consultant for the entire sizable chain of stores. Between 1965 and the time of his death Mr. Levin's salary had risen from $12,850 to $23,000, not including the moneys he received as a participant in his employer's profit-sharing plan. Based on Jerome Levin's wages and salary from 1965 through 1971, his promotion record, and an anticipated work life of 21 years until age 65, an economist testifying as an expert for the appellee estimated that Mr. Levin's projected future wage income reduced to present money value was $422,038. While this expert witness said he did not consult Levin's employer or co-workers in arriving at the projected wage income, the testimony of various witnesses supports the conclusion that Jerome Levin would have continued to advance in business, and that commensurate salary increases would have come with such advancement. Other testimony established the conservative life-styles of the Levins and their children and the work history of the children during their minority.[19]
 
 
 55
 Neither in its findings of fact and conclusions of law nor in the accompanying explanatory note did the trial court include specific mathematical calculations showing the method by which it arrived at the figure of $500,000 ($499,998) for loss of inheritance. However, our decisions teach that such mathematical precision is not required where the record clearly indicates that the trial court considered all appropriate circumstances and the varying importance of those circumstances in arriving at its award. See National Airlines, Inc. v. Stiles, supra, 268 F.2d at 404; Robey v. Sun Record Company, 5 Cir. 1957, 242 F.2d 684, 689-90; Petition of Risdal & Anderson,supra, 291 F.Supp. at 357. The amount of damages awarded by the court below for the items of loss here
 
 
 56
 under consideration was not clearly erroneous. We decline
 
 
 57
 to disturb it. THE AWARD OF $10,000 TO EACH OF THE
 
 LEVINS' ESTATES FOR CONSCIOUS PAIN AND
 SUFFERING PRIOR TO DEATH
 
 58
 Because the damages for the conscious pain and suffering of the two decedents prior to death were awarded below under the Florida Survival Statute, Section 46.021, Fla.Stat. (1971), Florida law governs our consideration of whether the plaintiff-appellee proved all necessary elements for recovery for this item.[20] The Florida jurisprudence is clear to the effect that for a personal representative to recover damages for his decedent's pain and suffering sustained as a consequence of another's wrong, the plaintiff must prove that the deceased was conscious between the time of the injury and the time of death, so that he actually felt and appreciated the pain resulting from the injuries. See Dobbs v. Griffith, Fla.1954, 70 So.2d 317; Doby v. Griffin, Fla. 2 D.C.A. 1965, 171 So.2d 404, 406-08; Morrison v. C. J. Jones Lumber Co., Fla. 2 D.C.A. 1961, 126 So.2d 895. In its explanatory note accompanying its findings of fact and conclusions of law the trial court acknowledged that there was no evidence as to the length of time that the Levins suffered prior to death, or whether the Levins were killed upon impact or survived for some time in the water. Nevertheless the court stated that it was "convinced that both of the deceased knew of the impending crash landing at sea, knew of the immediate dangers involved and are certain to have experienced the most excruciating type of pain and suffering (the knowledge that one is about to die, leaving three cherished children alone)".
 
 
 59
 While the evidence at trial was silent as to the exact length of time that the Levins were aware of the probability of their impending deaths, nevertheless the inference is reasonable, almost compelling, that they appreciated that possibility at least from the time of the radio transmission from Warren to Barbados Tower. That transmission also indicated Warren's intention to ditch the aircraft at sea, and there is no evidence to indicate that this did not occur. Thus all of the elements necessary under Florida law to support recovery for a decedent's pain and suffering were either proved or might reasonably be inferred by the trial court from the circumstances surrounding the aircraft's disappearance. Determination of the sufficiency of the evidence to support these claims was for the finder of fact under Florida law, in any event, Tuten v. Black, Fla., 1 D.C.A. 1971,247 So.2d 67.
 
 
 60
 While in the garden variety of claims under survival statutes, including the Florida Statute fatal injuries sustained in automobile accidents and the like the usual sequence is impact followed by pain and suffering, we are unable to discern any reason based on either law or logic for rejecting a claim because in this case as to at least part of the suffering, this sequence was reversed. We will not disallow the claims for this item of damages on that ground.[21] Cf. McLeod v. Young, Fla. 4 D.C.A. 1972, 257 So.2d 605, 608.
 
 
 61
 As to the amounts awarded, $10,000 to each estate, we view them as, if anything, on the very low side.[22]
 
 
 62
 The awards to appellees as personal representative of the two estates under the Florida Survival Act are sustained as justified by the evidence and
 
 
 63
 reasonable inferences therefrom. AWARD OF $8,000 TO EACH
 
 
 64
 CHILD FOR LOSS OF SCHOOLING OR FORMAL EDUCATION AT
 
 COLLEGE LEVEL
 
 65
 The district court based the award of this item of damage on the specific finding that "had Mr. and Mrs. Levin not met their untimely deaths, each of these children would have received a formal education at the college level". The testimony of the Levin children, Ellynn, Jeffrey, and Lawrence, and the appellee, Solomon, supports this finding. Both Jeffrey and Lawrence attended college and their tuition and expenses were paid by the Levins' estates. The amounts expended in this regard were proven by the testimony of Jeffrey and Lawrence, and that of the appellee, as well as by accountings from records of the estates. The appellants dispute the district court award of this item of damages, since (1) the estates contained ample monies to satisfy any educational needs or requirements of the Levin children, and (2) since any education desired by the children has already been paid for by the estates. The argument is that the Levin children have not suffered a cognizable pecuniary loss under DOHSA for lack of schooling at the college level.
 
 
 66
 But this theory of the availability of funds from the estates of their parents to pay for the college tuition and expenses of Jeffrey and Lawrence, fails to take into account the showing on the record before the trial court that the expenditure of these sums depleted the estates by such amounts. The evidence was clear that had the Levins lived these expenses would have been paid for by them, and also that the children would have been dependent on their parents during the time that they attended college and for the actual payment of their college tuition and incidental living expenses. The district court considered specifically in fixing the awards for loss of prospective inheritance the amounts which the Levins would have spent on college educations for their children. The court did not commit error in its award of $8,000 to the appellee for the pecuniary loss of schooling or formal education by Jeffrey and Lawrence Levin.
 
 
 67
 However, we conclude that the record does not support the award of this item of damages for Ellynn Levin. Ellynn testified that while she intended at the time of her parents' deaths to enroll in college, she did not in fact attend. She cited the necessity of her maintaining a home for her younger brothers as her reason for not carrying out her plans for college. But after Jeffrey and Lawrence left home and this reason had lost validity, Ellynn failed to follow up her prior interest in obtaining a college education. We think therefore that since Ellynn did not attend college and made no further plans to attend college, the award of damages for her loss of schooling at the college level was speculative, and without evidentiary support. The district court erred when it awarded this item of damages for the benefit of Ellynn Levin.
 
 
 68
 Since award of the items of damages approved still considerably exceeds the INA policy limits of $300,000, the reduction in damages by the elimination of this $8,000 and the $150,000 eliminated, supra, for loss of parental guidance for each child from each parent, both shall inure to the benefit of Stanley Warren, as Executor. The amount of damages of $300,000 awarded against INA is not affected.
 
 ISSUES UNDER THE CROSS-APPEAL
 
 69
 A. DENIAL OF THE MOTION FOR PRE-JUDGMENT INTEREST.
 
 
 70
 The prevailing rule in this circuit is that the award of pre-judgment interest in death claims under DOHSA is discretionary with the trial court. See National Airlines, Inc. v. Stiles, supra, 268 F.2d at 404-06. Cf. Doucet v. Wheless Drilling Company, 5 Cir. 1972, 467 F.2d 336, 340; Dennis v. Central Gulf S.S. Corp., 5 Cir. 1972, 453 F.2d 137, 141, cert. denied,409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218. We find no abuse of discretion in the trial court's denial of the plaintiff-appellee's motion for pre-judgment interest on the damages awarded on the DOHSA cause of action.
 
 
 71
 B. DENIAL OF THE MOTION TO ASSESS ATTORNEYS' FEES AGAINST INA.
 
 
 72
 Pursuant to Florida Statute Section 627.428, an insured may recover attorney's fees from his insurer where the insured prevails in an action against the insurance company, securing a judgment against it. On the cross-appeal the appellee contends that because INA denied coverage on the policy herein until 21/2 days prior to the trial of this action, he was entitled to have the trial court assess attorneys' fees against INA, which he sought at trial by motion. Appellee's theory rests on the Florida Supreme Court's decision in Shingleton v. Bussey, Fla.1969, 223 So.2d 713, to the effect that an injured plaintiff is a third-party beneficiary of a liability insurance contract, may sue a tortfeasor's insurance carrier direct, along with the action against the insured tortfeasor. Appellee urges that where, as here, the plaintiff has sued the insured and the insurer in the same action, and the latter denies coverage, the plaintiff is entitled to recover attorneys' fees under Section 627.428, Fla.Stat. (1971), as an incident to the judgment against the insurer.
 
 
 73
 This particular issue must be decided against appellee. INA admitted coverage, even though only 21/2 days before trial, and hence the appellee was not required to litigate and prove INA's coverage at the trial. See Wilder v. Wright, Fla.1973, 278 So.2d 1; Central National Insurance Company v. Gonzalez, Fla. 3 D.C.A. 1974, 295 So.2d 694. It was not error for the district court to deny the appellee's motion for assessment of attorneys' fees.
 
 CONCLUSION
 To recapitulate:
 
 74
 (a) We affirm the holding of the district court that the negligence of Paul Warren was a proximate cause of the deaths of Jerome Levin and Leatrice D. Levin.
 
 
 75
 (b) We find no error in the admission into evidence by the district court of the transcription of the final radio communication between Paul Warren and the Barbados Tower.
 
 
 76
 (c) We affirm the award by the district court to appellee as the personal representative of the estate of Jerome Levin and Leatrice D. Levin, under the Florida Survival Act, for conscious pain and suffering prior to their deaths, in the amount of $10,000 to each estate.
 
 
 77
 (d) We affirm the award of damages under DOHSA for the loss of formal education and schooling at the college level for the benefit of Jeffrey Levin and Lawrence Levin, in the amount of $8,000 each, and we reverse and set aside the similar award for the benefit of Ellynn Levin. The effect of this holding is to reduce the total judgment by $8,000.
 
 
 78
 (e) We reverse the award of damages under DOHSA in the amount of $25,000 for the benefit of each child arising from the wrongful death of each parent for the loss of parental guidance and training after majority. The effect of this holding is to reduce the total judgment by $150,000.
 
 
 79
 (f) The awards for the benefit of each child of $83,333 for loss of inheritance from each of the estates of Jerome and Leatrice D. Levin, totaling $166,666 for the benefit of each child, (a total of $499,998) are affirmed.
 
 
 80
 (g) The reductions for claimed items of damages disallowed directed by (d) and (e) above, totaling $158,000, shall be made in the judgment for $434,998 against Stanley Warren, as Executor of the Estate of Paul Warren, reducing the same to the amount of $276,998. The judgment against INA in the amount of its policy limits, $300,000, is unaffected by the disallowance of the claimed items of damages.
 
 
 81
 (h) As to the issues raised by the cross-appeal, the denial of the award of pre-judgment interest and the denial of the award of attorneys' fees to appellee, we affirm.
 
 
 82
 The judgment against Stanley Warren as Executor is REVERSED, with directions to the district court for the entry of judgment in accordance herewith; the judgment against INA is AFFIRMED.
 
 
 83
 Each of the parties shall bear his or its own costs.
 
 
 84
 AFFIRMED IN PART; and REVERSED IN PART.
 
 GEE, Circuit Judge (dissenting):
 
 85
 I dissent from the affirmance of two elements of damages awarded by the district court. The first of these is $20,000 awarded for conscious mental pain and suffering presumed apprehension preceding deaths which occurred in a manner of which we know nothing. The second is a half-million dollar award for lost additions to the decedents' estates, additions which had not at their deaths (and might never have) occurred. Both awards seem to me to be based on almost pure guesswork. With the remainder of the otherwise excellent majority opinion, I fully concur. But these awards rest upon endowing the trial judge with a prescience in the absence of any evidence which I am unwilling to accord him, or any other man. In the presence of judicial action grounded in such cloudy generalities, I conceive that an issue approaching constitutional proportions is presented, for the defendants seem to me to be here presently deprived of their property to recompense the plaintiffs, not for actual or even statistically probable losses, but for mere possibilities. More important, however, is that this award entails a double or at least largely overlapping recovery.
 
 
 86
 (1) Conscious Mental Pain and Suffering.
 
 
 87
 We deal with passengers in an aircraft which simply vanished at sea. Beyond this, the record reveals nothing except that the pilot believed himself to be, and probably was, low on fuel and that when last heard from he was seeking to ditch the aircraft near a merchant vessel. The rest is silence.
 
 
 88
 On this evidence the court below awarded, and we now affirm, a very modest increment of damages for conscious mental pain and suffering assumed by the court to have been experienced by the two decedent passengers before death. The trial judge explained the basis of this award as follows:
 
 
 89
 In awarding the sum of $10,000 to the Estates of JEROME E. LEVIN and LEATRICE D. LEVIN for conscious pain and suffering experienced before death, the Court is aware that the evidence does not reflect the precise mechanism of death, nor the time involved; however, the Court is absolutely convinced that both of these deceased knew of the impending crash landing at sea, knew of the immediate dangers involved and are certain to have experienced the most excruciating type of pain and suffering (the knowledge that one is about to die, leaving three cherished children alone). The Court does not know whether this experience lasted five minutes or many hours, nor whether the deceased were killed upon impact or survived for sometime in the water. Under these circumstances, the Court has awarded what it feels is a minimum compensation for this type of damage.
 
 
 90
 There is, of course and as the district judge above acknowledges, no evidence to support a finding whether death of either passenger was instantaneous or not. It follows that there can be no finding, one way or the other, about conscious pain or suffering after impact or about any physical suffering whatever. The record therefore simply affords no basis for concluding, as Florida law requires for such an award, that either victim survived the impact or was conscious of pain for any period of time thereafter.[1] Dobbs v. Griffith, 70 So.2d 317 (Fla.1954), and other authorities cited supra, p. 792.
 
 
 91
 We are thus presented with an award for a new element of damages, apprehension experienced before a death which for all we know was instantaneous. This is new Florida law confected by a federal court. Under Florida law, mental suffering is not recoverable in the absence of a physical trauma occasioning it,[2] and our court has followed this "no impact-no recovery" rule in a decision binding on this panel.[3] The majority professes that it has not departed from the impact rule but has only reversed a sequence to allow recovery when the impact follows the fear, as well as when the impact precedes the mental suffering. But to reverse the sequence is to abandon the rationale of the impact rule: any compensated mental pain and suffering must be caused by a physical impact. The airplane crash and the Levins' resulting deaths were not the "but for" cause of whatever anxiety they may have suffered prior to their deaths. Their prior fears would not have been diminished had the plane leveled off at the last moment and avoided disaster altogether. This is because the Levins' anxiety for their own safety and their children's future well being was caused by the anticipation of death, not by the actual crash that presumably killed them. It is not enough that some impact accompany the mental suffering; the impact must cause the fears if they are to be compensable. Only then can courts measure mental duress by some means other than sheer speculation.
 
 
 92
 The majority can cite no Florida case that has awarded damages for pain and suffering prior to an impact. I suggest that this is because Florida courts have felt that the sequence of impact followed by pain and suffering is at the heart of the Florida Survival Statute, section 46.021, Fla.Stat. (1971). At best, Florida law is unsettled on this point, and the majority is making new state law which cuts against the logical implications of Florida's impact rule. I think we act presumptuously to sanction an award based on fear preceding an impact which may have been obliterating and therefore essentially painless. We act without any notion of these presumed fears' durations, a customary consideration in assessing damages for suffering of any kind. We may, or may not, be acting on unknown facts involving a martyr's death or deaths: unknown hours (or days) at sea, followed by a shark attack or by exhaustion and death by drowning. Or the truth may involve a confident approach to ditch alongside a freighter which was assumed to have seen the aircraft, followed by a sudden stall and instant death. We cannot know, nor could the court below have known. Yet an award of $20,000 has been made, apparently in the view that these constitute nominal damages. The majority has opened the door to such uncertainties by reversing the sequence of impact followed by pain and suffering. I would either follow Florida precedent in its apparent logical course or would certify, and I regret that the majority conceives itself properly empowered to do otherwise.
 
 
 93
 (2) Loss of Right to be Bequeathed Presumed Accumulations to Decedents' Estates.
 
 
 94
 I am also troubled by the extension of what I regard as the dubious holding in National Airlines, Inc. v. Stiles, 268 F.2d 400 (5th Cir.), cert. denied, 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959), that a widow may recover damages to compensate her for the lost right to inherit future accumulations to her deceased husband's estate. We here hold that children may do likewise.
 
 
 95
 In what follows, I shall attempt to demonstrate that the principle of awarding damages for lost future earnings, which commenced in the wage earner's suit for his own lost earnings and there rests on a sound dual basis of statistical averages and projection of factors within the wage earner's own control, was pressed by Stiles to and perhaps beyond the limits of rationality and passes, with our decision, into areas of pure speculation. This is so because, with each stage of superficially logical extension, several new factors either incapable of statistical treatment or impossible of rational projection from past performance[4] are introduced. The end result is a process which no longer merits description as calculation. Rather it consists of a sort of visceral guess by the factfinder, based mostly on a cloud of floating imponderables.
 
 
 96
 Stiles necessarily, if implicitly, rests upon the well-established principle that a permanently disabled worker may recover on the basis of his life or worklife expectancy for the value of lost earnings, earnings which he can no longer produce because of his injury. Even here there are obvious uncertainties.[5] But these are tolerable, since mortality tables themselves represent statistical averages incorporating untimely deaths as well as timely, and the injured person had unquestioned possession of his own earning capacity and dominion over any actual earnings derived from it. And in view of the mildness and small number of these uncertainties, it has seemed reasonable to assume the probable extension into the future of his performance record in the past.
 
 
 97
 The death action by a surviving spouse for future contributions from lost earnings of the deceased injects additional uncertainties: whether the survivor and the deceased would have remained married or parted under such circumstances as to create a continuing duty of support, how long the survivor would have lived, what the amount of future contributions would have been. Here again, however, the future has seemed subject to rational prediction on the basis of past performance, on evidence of the degree of affection and stability of relationship between the spouses, evidence of the deceased's record of personal consumption vis-a-vis contributions to the survivor, and by limiting recovery by reference to the lesser of the life expectancies of the two spouses.[6]
 
 
 98
 With Stiles, however, a further element of recoverable damages was recognized by the law of this circuit: the loss of the survivor's hope to be bequeathed not the decedent's estate, for she actually received that by bequest but presumed future accumulations to it.
 
 
 99
 And so, under Stiles, the death of a breadwinner gives rise to two elements of damage based on his projected future earnings and income:
 
 
 100
 (1) Contributions which would have been made from them to the surviving spouse.
 
 
 101
 (2) Loss of the surviving spouse's "right" to inherit or be bequeathed what Stiles terms the "accumulations" from income which the decedent would have come into during his lost life expectancy.[7]
 
 
 102
 This second element is arrived at by reasoning that if the decedent could have recovered for his lost earning capacity had he merely been disabled, and if his surviving spouse may properly recover probable lost contributions from future earnings, that spouse should also recover the value of lost accumulations which the decedent would probably have bequeathed her.[8] With this element of future accumulations, the majority opinion in Stiles extends the lost-earnings principle to new ground. The case for this extension is, however, disfigured by the number of additional serious and massive uncertainties which it introduces into the process of predicting the future by projecting the curve of the past.
 
 
 103
 It is doubtless reasonable to predict that one who has been accumulating a portion of his earnings will continue to do so, and in roughly the same proportion; these are matters within his control, and a pattern of how he exercises that control may be ascertained from his habits of the past. But Mr. and Mrs. Levin were investors, and it is common knowledge that investors sometimes win and sometimes lose even what they began with, often after long periods of success and even though prudent. They do so because the factors which affect investments are usually not entirely or even largely within the investors' control: general economic trends, local ones, governmental actions, occasional moments of bad judgment, to cite only a few. Thus, an investor's personal performance in the past forms an inadequate statistical basis for an assured projection into the future; a sounder basis, more analogous to mortality tables, would be the performance of a statistically valid sample of investors over an appropriate period of time, did such a study exist. But it is on a projection of personal performance as an investor, beset as it is with uncontrollables and unknowables, that at least a portion of the award here affirmed rests.
 
 
 104
 Even as to a widow's recovery for such lost expectancies of inheritance a further uncertainty exists. As the majority notes, the husband has a duty both moral and legal to contribute to her support from his earnings; and this duty, taken together with the pattern of his past contributions, forms a sound basis for predicting what he would have done had he lived. He has, however, no such duty to leave her all of his estate, or even part of it. This belongs to him and he may, if of sound mind, bequeath it as he likes.[9] A will may be changed at any time, as many heirs-presumptive have discovered to their sorrow. Common sense tells us that it is a risky business to project a present intention manifested by a present disposition in a will thirty years[10] into the future. Again, as in the case of projecting investment success, we here approve a guess about the future based not on an average but on one man's behavior to a given date. Nor are the events which may influence his disposition entirely within his control.
 
 
 105
 When these two new imponderables are multiplied together, as by statistical practice they must be, even Stiles permits the defendant to be mulcted in a present sum for a noncalculable increase in value to the estate which the decedent might have left to his widow if he still felt like giving her all or some unknowable proportion of it many years later.
 
 
 106
 Even that, however, is not this case. For here we add the assumption that both parents would have bequeathed their shares of this increment equally to three children, all of whom would be living at the death of each parent. The unfounded assumptions involved simply in projecting an equal taking by each child are legion: that all three children will outlive both parents, that none will marry wealth, that none will suffer disabling personal disaster, that none will have a serious falling out with either parent, etc., ad infinitum. The portion of the award we here affirm is a guess. Not a bad guess, doubtless, but a guess all the same.[11]
 
 
 107
 Finally, there remains the intractable problem of the double recovery noticed above at footnote 7. In awarding the half-million dollar projected accumulation, based on the Levins' "established pattern of savings and investment in real estate and similar properties," the court assumed that most of this increase would be produced by the estates of the Levins (valued at approximately $275,000), not from Mr. Levin's salary, because the bulk of his $23,000 salary would have been used for living expenses, not investment. To the extent that the court's award of future accumulations rests on the existing estate as the source of such increases, the children have received a double recovery the projected returns and resulting accumulations which the estate would have produced in the parents' hands over the next 30 years and the actual returns from the same estate which is now in their hands. Thus, the same estate, during the same period, is somehow made to produce two returns, an actual one in the children's hands and a fictitious one in their parents' and the children receive both of them. This result seems to me to be clearly wrong and most unjust, indeed punitive.
 
 
 108
 I therefore respectfully dissent from the affirmance of these two elements only of the damages awarded, but with the added observation that since they aggregate the overwhelming proportion of the total damages, I would reverse for a new trial of the damages issue.
 
 
 
 [1]
 The complaint also named as defendants Horizon Hunters, Inc., the owner of the aircraft, and its insurer Ranger Insurance Company. Prior to the trial of this action Horizon Hunters and Ranger Insurance entered into a settlement agreement with the appellee, and were dismissed as defendants
 
 
 [2]
 The parties agree that the disappearance of the aircraft occurred over international waters, and that the applicable federal statute is the Death on the High Seas Act, Title 46, U.S.C., Section 761. That section provides:
 "Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."
 
 
 [3]
 An obvious mistake. Clearly, from the tenor of all the findings and conclusions, the intent was to state that said negligence was a "direct and proximate cause" of the deaths of the Levins. The parties all treat this as the meaning; we follow suit
 
 
 [4]
 The trial was commenced on April 29, 1974, prior to the effective date of the Federal Rules of Evidence July, 1975. Rules 803(24) and 804(b)(5) seem clearly to authorize receipt into evidence of the transcription in question
 
 
 [5]
 We quote in full the transcription, Plaintiff's Exhibit 13, of this radio communication:
 "SS KMIAYC MJSJYC
 271900 MKPBYA
 REF 271538 KMIAYC STOP 8P-LAC
 AN AIRCRAFT IN FLIGHT WAS USED TO RELAY MESSAGES TO N5310S AS HE WAS TOO LOW TO RECEIVE OUR TRANSMISSIONS STOP 231918 MY AH ONE OF MY MAIN TANKS AH PRESENTLY ON A 240 RADIAL OFF YOUR STATION UNQUOTE 8P-LAC ASKED QUOTE UNDERSTAND YOU ARE ON THE 240R IN BOUND TO SEAWELL IS THAT CORRECT UNQUOTE N55310S REPLIED QUOTE 264 RADIAL INBOUND TO SEAWELL PAUSE MY ESTIMATED FUEL UNKNOWN PAUSE VERY LOW UNQUOTE WHEN ASKED IF HE HAD BARBADOS IN SIGHT HIS REPLY WAS QUOTE HEADING 65 PAUSE 065 UNQUOTE WHEN ASKED HOW MUCH FUEL WAS LEFT N5310S REPLIED QUOTE THE TANKS ARE READING EMPTY UNQUOTE 8P-LAC ASKED HOW LONG HAVE YOU BEEN AIRBORNE AND THE REPLY WAS QUOTE FIVE HOURS AND TWENTY MINUTES FIVE HOURS AND TWENTY-FIVE MINUTES UNQUOTE WHAT WAS YOUR TOTAL ENDURANCE QUOTE SIX HOURS AND FIFTEEN MINUTES THE FRONT GAS TANK BURNED FASTER THAN EXPECTED UNQUOTE WHEN ASKED IF HE HAD AN ADF HIS REPLY WAS QUOTE MY VOR RADIAL SAYS 084 TO STATION UNQUOTE NEXT SIGNIFICANT REPORT AT 231914 QUOTE I HAVE A VESSEL IN SIGHT I'M HEADING FOR IT I CAN'T TELL THE TYPE OF VESSEL AT THIS TIME MY MAGNETIC COMPASS HEADING IS 085 UNQUOTE HAVE YOU AN ADF ON BOARD N5310S REPLIED QUOTE MY VOR RADIAL SAYS 084 TO STATION UNQUOTE ARE YOU STEERING THIS HEADING AND AFFIRMATIVE WAS THE REPLY STOP NEXT TRANSMISSION FROM N5310S QUOTE I HAVE A MERCHANT VESSEL IN SIGHT IT HAS THREE LARGE SQUARE FRAMES ON ITS DECK UNQUOTE AND FINAL TRANSMISSION WAS QUOTE 10S I THINK MY FUEL IS GOING OUT THE MERCHANT VESSEL HAS A K ON ITS FUNNEL I'LL BRING IT DOWN AS CLOSE TO THE VESSEL AS I CAN UNQUOTE".
 
 
 [6]
 The appellants did not contest in the district court that the Cessna aircraft bearing F.A.A. registration No. N5310S was lost at sea in the Caribbean on July 23, 1971, that Paul Warren was the pilot of that aircraft, and that the Levins were passengers on the aircraft
 
 
 [7]
 Although the doctrine of res ipsa loquitur was pleaded alternatively in the plaintiff-appellee's second amended complaint, the district court declined to apply res ipsa in resolving the issue of liability. But see Cox v. Northwest Airlines, Inc., 7 Cir. 1967, 379 F.2d 893, cert. denied 1968, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836; Blumenthal v. United States, 3 Cir. 1962, 306 F.2d 16
 
 
 [8]
 In Movible Offshore, Inc. v. M/V Wilken A. Falgout, 5 Cir. 1973, 471 F.2d 268, 271, Judge Goldberg stated for us:
 "The question is not simply whether the reviewing court would have found otherwise but whether the trial court could permissibly find as it did. The reviewing court should upset a finding only when it 'is convinced on the whole record that the finding does not reflect the truth and right of the case'. Wright, Federal Courts § 96, at 432."
 
 
 [9]
 Title 46, U.S.C., Section 762 provides:
 "The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought."
 
 
 [10]
 For purposes of clarity we tabulate the various items of damages awarded by the district court to each child under the DOHSA cause of action for the pecuniary losses resulting from the death of the Levins:
 Item of Damage Ellynn Jeffrey Lawrence
 -------------- ------ ------- --------
(A) For the death of Jerome E.
 Levin:
 (1) Loss of support 1,000.00 2,000.00 5,000.00
 (2) Loss of parental guidance
 and training through
 minority 2,500.00 4,000.00 10,000.00
 (3) Loss of parental guidance
 and training after reaching
 majority 25,000.00 25,000.00 25,000.00
 (4) Loss of schooling or formal
 education at college level 8,000.00 8,000.00 8,000.00
 (5) Loss of inheritance 83,333.00 83,333.00 83,333.00
 ----------- ----------- -----------
 TOTAL $119,833.00 $122,333.00 $131,333.00
(B) For the death of Leatrice
 D. Levin:
 (1) Loss of parental guidance
 and training through
 minority 2,500.00 4,000.00 10,000.00
 (2) Loss of parental guidance
 and training after reaching
 majority 25,000.00 25,000.00 25,000.00
 (3) Loss of inheritance 83,333.00 83,333.00 83,333.00
 ----------- ----------- -----------
 TOTAL $110,833.00 $112,333.00 $118,333.00
 ----------- ----------- -----------
TOTAL DOHSA DAMAGES $714,998.00
 The appellants raise no challenge either to the award of or to the quantum of the damages provided to the Levin children for the loss of parental guidance and training through minority, and for the loss of support. See Moore-McCormack Lines, Inc. v. Richardson, 2 Cir. 1961, 295 F.2d 583, cert. denied, 1962, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526, cert. denied, 370 U.S. 937, 82 S.Ct. 1577, 8 L.Ed.2d 806.
 
 
 [11]
 The loss by a child of parental guidance and nurture is a separate item of damage from the loss of a parent's society and companionship, which is not a recoverable item of damage under the pecuniary loss test of DOHSA. See Middleton v. Luckenbach S. S. Co., 2 Cir. 1934, 70 F.2d 326, 330, cert. denied, 293 U.S. 577, 55 S.Ct. 89, 79 L.Ed. 674; Petition of Canal Barge Co., N.D.Miss.1971, 323 F.Supp. 805, aff'd in part and rev'd in part sub nom, Petition of M/V Elaine Jones, 5 Cir. 1973, 480 F.2d 11; First National Bank in Greenwich v. National Airlines, Inc., S.D.N.Y.1958, 171 F.Supp. 528, aff'd, 2 Cir. 1961, 288 F.2d 621, cert. denied, 368 U.S. 859, 82 S.Ct. 102, 7 L.Ed.2d 57. Cf. Sea Land Services, Inc. v. Gaudet, 1974, 414 U.S. 573, 586-87, 94 S.Ct. 806, 39 L.Ed.2d 9
 
 
 [12]
 Although in Michigan Central R. Co. v. Vreeland, 1913, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417, recovery for loss of nurture under the Federal Employers' Liability Act, Title 45, U.S.C., Section 51, (F.E.L.A.), was at issue, the F.E.L.A. and DOHSA are both Lord Campbell's Act type of statutes, 9 & 10 Vict. c. 93, and this and other courts have held that the measure of damages for wrongful death is the same under both Acts. National Airlines, Inc. v. Stiles, 5 Cir. 1959, 268 F.2d 400, cert. denied, 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121; Martin v. Atlantic Coast Line Railroad Company, 5 Cir. 1959, 268 F.2d 397; Middleton v. Luckenbach S.S. Co., supra
 
 
 [13]
 We express no view as to whether a surviving child may recover damages for loss of support after reaching majority. See First National Bank in Greenwich v. National Airlines, Inc., supra, 171 F.Supp. at 539; Peterson v. United New York Sandy Hook Pilots Association, E.D.N.Y.1936, 17 F.Supp. 676
 
 
 [14]
 In Martin v. Atlantic Coast Line Railroad Company, 5 Cir. 1959, 268 F.2d 397, decided the same day as Stiles this court held that a widow's loss of anticipated inheritance was a proper element of damages under the implied pecuniary loss standard of the F.E.L.A. See note 12 supra
 
 
 [15]
 This excerpt was quoted with approval by Judge Tuttle for the panel in Martin v. Atlantic Coast Line Railroad Company, supra, as typical of statements found in the leading texts on damages and actions for wrongful death, 268 F.2d at 399. See note 14 supra
 
 
 [16]
 The Levins' wills contained identical clauses devising and bequeathing all of their property to their children in the event of their simultaneous deaths. Plaintiff's Exhibits 20 & 21
 
 
 [17]
 Fla.Stat. Section 731.23(3), now Fla.Stat. Section 732.103(1)
 
 
 [18]
 These life expectancy figures were read into evidence at trial by plaintiff-appellee's counsel from what he identified as a pamphlet sponsored by the United States Department of Health, Education and Welfare, "Vital Statistics of the United States 946 (sic), Volume II, Section 5, Live Tables" (Tr. p. 267)
 
 
 [19]
 The trial court in arriving at the amount of the award for loss of inheritance correctly deducted from that amount the estimated living expenses of the Levins during the anticipated remainder of their lives
 
 
 [20]
 It is settled that DOHSA does not provide recovery for pain and suffering experienced by the decedent prior to his death. See Barbe v. Drummond, 1 Cir. 1974, 507 F.2d 794, 797; Dennis v. Central Gulf S.S. Corp., 5 Cir., 1972, 453 F.2d 137, 140, cert. denied, 409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218. But of course recovery under DOHSA for certain other items of damages does not preclude the plaintiff as personal representative of the two estates from alleging a cause of action in the pendent claims under the Florida Survival Act, Sec. 46.021, Fla.Stat. (1971). Dennis v. Central Gulf S.S. Corp., supra
 
 
 [21]
 Whether recovery for conscious pain and suffering in an action brought under Fla.Stat. § 45.11 is limited to situations where there is an initial physical injury to the decedent, followed by conscious pain and suffering, or whether the statute also applies to situations where as here part or perhaps all of the conscious pain and suffering occurs prior to any physical injury, is a question never raised by the appellants on this appeal, either on brief or in oral argument. But the observation in the text, supra, to the effect that recovery under the statute should be allowed in either situation has stimulated the attention and the strong disapproval of the dissent of Judge Gee, who would disallow the awards for conscious pain and suffering under § 45.11, Florida Statutes, on these as well as other grounds
 We conclude that in these circumstances the statement in the text should stand as written.
 We observe, however, that reliance upon Gilliam v. Stewart, Fla.1974, 291 So.2d 593 (overruling Stewart v. Gilliam, 4 D.C.A. 1973, 271 So.2d 466), cited by Judge Gee's note 1, as the "Florida Supreme Court's definitive opinion * * * by which Florida embraced the impact rule for recovery of mental anguish." is misplaced.
 Stewart, as well as Herlong Aviation, Inc. v. Johnson, Fla.1974, 291 So.2d 603, cited in Judge Gee's note 4, simply adhered to the precedent long prevailing in Florida to the effect that no recovery can be had for mental pain and suffering unaccompanied by any physical impact, in the absence of wantonness, wilfullness or malice. See the cases collected at page 469, Volume 271 So.2d, in the majority opinion of the Fourth District Court of Appeals in Stewart v. Gilliam, beginning with Clark v. Choctawhatchee Electric Co-Operative, Fla.1958, 107 So.2d 609. In de Saric v. Miami Caribe Investments, Inc., 5 Cir. 1975, cited by Judge Gee in his note 3, this court simply adhered to Florida's "no-impact-no recovery" doctrine.
 The question involved in all such cases is foreign to the subject here under discussion: If impact to the person is present, may it follow as well as precede conscious pain and suffering when used as the basis for recovery for such conscious pain and suffering in an action under Fla.Stat. § 46.11?
 
 
 [22]
 For cases affirming substantial awards for minimal periods of pain and suffering, see: Nimnicht v. Ostertag, Fla. 1 D.C.A. 1969, 225 So.2d 459; Ward v. Orange Memorial Hospital, 4 D.C.A. 1966, 193 So.2d 492; F.E.C. Ry. Co. v. Stewart, Fla. 3 D.C.A. 1962, 140 So.2d 880. See further, McLeod v. Young, Fla. 4 D.C.A. 1972, 257 So.2d 605; Legare v. United States, S.D.Fla.1961, 195 F.Supp. 557
 
 
 [1]
 In support of its holding the majority cites McLeod v. Young, 257 So.2d 605 (Fla.App.1972). Although some language in that opinion suggests support for the majority's position by acknowledging the possibility of mental anguish in knowing of impending impact, the mental anguish claim was inextricably tied to a conscious pain and suffering claim so that the final result is ambiguous at best. In any event, McLeod was decided before the Florida Supreme Court's definitive opinion in Gilliam v. Stewart, 291 So.2d 593 (Fla.1974), by which Florida embraced the impact rule for recovery of mental anguish
 
 
 [2]
 Herlong Aviation, Inc. v. Johnson, 291 So.2d 603 (Fla.1974); Gilliam v. Stewart, 291 So.2d 593 (Fla.1974)
 
 
 [3]
 de Saric v. Miami Caribe Investments, Inc., 512 F.2d 1013 (5th Cir. 1975)
 
 
 [4]
 Because not within the control of the person whose performance is being projected
 
 
 [5]
 That he would have continued to work at his former or some comparable employment or would at least have retained a capacity (of comparable value) to do so, one not destroyed by untimely death or diminished by subsequent injury, loss of incentive or other unforeseeable future event
 
 
 [6]
 The Stiles decision appears to rest in part on actual ownership by the survivor, under community property rules, of one-half of the deceased spouse's lost earnings, and to this extent not on expectancy of inheritance at all
 
 
 [7]
 The Stiles opinion does not appear to recognize that some of these "accumulations" will represent return from the assets which the decedent owned at death and which the spouse received by bequest. Thus, the survivor receives these "accumulations" twice: once from the inherited assets' actual return in her own hands and again by a judgment granting her what the court presumed they would have returned to her spouse during his projected life expectancy
 
 
 [8]
 Especially where, as in Stiles, a system of community property in the jurisdiction insures that the survivor would of necessity receive, not by inheritance but as the rightful owner, one-half of any such accretions to the community estate. Florida, however, is not a community property jurisdiction, though it does provide a system of partial forced heirship to surviving spouses. Fla.Stat. §§ 732.201-732.212
 
 
 [9]
 Subject, in Florida, to the surviving spouse's right to take a limited portion (30%) of much of his estate "against the will." Fla.Stat. § 732.207
 
 
 [10]
 Mr. Levin's life expectancy was about 28 years, Mrs. Levin's about 33
 
 
 [11]
 One wonders what the result would have been had one parent left a recently-executed will disinheriting one of the children. Would the guess be that, since the feelings which lie behind such dispositions often mellow with the passage of time, an equal bequest to each child should nevertheless be assumed?