274

Volpe M. BOYKIN, Administrator of the Estate of Denzil J. Pereira, Plaintiff,

v.

BERGESEN D.Y. A/S, China Steel Corporation, U.S. Steel Mining Co., Inc. Wescol Shipping, Inc., t/a Lavino Shipping Agencies, Inc. Defendants,

T. Parker Host, Inc., Interested Party,

Eimskip, USA, Iceland Steamship, Inc., Interested Party.

BERGESEN D.Y. A/S, Cross–Claimant,

v.

CHINA STEEL CORPORATION, U.S. Steel Mining Co., Inc., Cross–Defendants.

U.S. STEEL MINING CO., INC., Cross–Claimant,

v.

BERGESEN D.Y. A/S, Cross–Defendant.

Civ. A. No. 2:92cv391.

United States District Court, E.D. Virginia, Norfolk Division.

Oct. 4, 1993.

See also 822 F.Supp. 324.

Jeffrey Arnold Breit, Breit, Drescher & Breit, Norfolk, VA, for plaintiff.

Denham Arthur Kelsey, John E. Holloway, Andrew Jackson Timms, Hunton & Williams, Norfolk, VA, for defendant, Bergesen D.Y. A/S.

Morton Hutchinson Clark, Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for defendants, U.S. Steel Min. Co., Inc. and China Steel Corp.

### OPINION AND ORDER

MORGAN, District Judge.

This matter comes before the Court for decision upon claims arising out of a maritime casualty aboard the merchant ship M/V BERGE CHARLOTTE. After various pretrial motions, the parties to this action at trial were as follows: Plaintiff Volpe M. Boykin ("Boykin") as administrator of the estate of Denzil J. Pereira ("Pereira") maintains a suit against Defendants U.S. Steel Mining Co., Inc. ("USS") and China Steel Corporation ("China Steel")[1] for damages related to Pereira's death. Defendant and Cross-claim Plaintiff Bergesen D.Y. A/S ("Bergesen"), the owner of the BERGE CHARLOTTE, maintains a claim against Cross-claim Defendants Steel for physical damage to the ship and related losses, and for contribution or indemnity for various payments made by Bergesen to other persons as a result of the incident. Plaintiff Boykin later dismissed with prejudice its claim against China Steel. Defendants Steel also cross-claim against Cross-claim Plaintiff Bergesen for any liability they owe to Plaintiff Boykin, and contend that any liability they have toward Cross-claim Plaintiff Bergesen should be reduced owing to Bergesen's comparative negligence.

---

1. Where the discussion applies equally to both USS and China Steel, the parties will be referred to collectively as "Steel."

## A. Background

On the morning of October 27, 1990, the BERGE CHARLOTTE was sailing off the coast of Africa bound for Kao Hsing (pronounced "Cow Shung"), Taiwan. At Kao Hsing, she was to discharge a load of coking coal which China Steel had purchased from USS. The BERGE CHARLOTTE was a large bulk cargo ship of nearly three-hundred meters in length. Her master was the Plaintiff's decedent, Captain Denzil Pereira. Shortly before 11:00 a.m. GMT, an explosion occurred in the Number Three cargo hold which blew the two hatch covers off and did substantial damage to the surrounding fixtures. At the time of the explosion, the Master, the Chief Officer, the Bosun, a Fitter and an able bodied seaman were working in the vicinity of the Number Three hold. Three men were killed and two others were missing and presumed killed. There are no surviving witnesses to the work who admit being eye witnesses to the fateful moment.[2] It is clear from the evidence that the explosion was caused by an ignition of methane gas which had been released from the coal and accumulated in the air spaces of the hold. The difficult question is what caused the gas to ignite and what parties, if any, are to be held liable for the losses.

Boykin and Bergesen contend that the Steel Defendants were negligent in misrepresenting the character of the cargo which ultimately caused the explosion which killed Pereira, and for failing to warn of the dangerous nature of the cargo. The Steel Defendants contend that Pereira and Bergesen were guilty of comparative negligence for failing to take adequate precautions against such an explosion and for allegedly supplying the source of ignition for the explosion.

## B. The Properties of Pinnacle Coal

The coal contained in the Number Three hold was part of a shipment which had been loaded onto the BERGE CHARLOTTE at Norfolk, Virginia on October 8, 1990. In fact, hold numbers One, Three, Five, Seven and Nine all contained this USS coal called "Pinnacle." The even numbered holds (Two, Four, Six and Eight) had been loaded with coal supplied by the Island Creek Company. Pinnacle is a blend of two coals mined from USS's Number 50 and Shawnee Mines. Both mines are located in a geological structure known as the Pocahantas Number Three seam which generally yields "metallurgical low-volatile blending coal." (Tr. of June 10 at 14, Testimony of William F. Berry, Ph.D. ("Berry")).

Different coals, depending on their source, will have different characteristics and therefore, different uses. For the purposes of this dispute, an important issue is the "gassiness" or methane emitting properties of the Pinnacle coal aboard the BERGE CHARLOTTE. Coal from the Pocahantas No. Three seam is generally used as a "coking" coal in firing steel smelters. It is considered a "deep mine" coal because, rather than being recovered from a strip mine close to the surface, this coal is mined in very deep tunnels far beneath the surface of the earth. (Id. at 16.) The overlaying earth exerts great pressure on such coal. Since coal is the product of the breakdown of organic materials, it generally contains the byproducts of such breakdown including methane. It is in part because of the great pressure which is part of the process of creation of deep mine coal that it may emit substantial quantities of methane gas upon being removed from the mine face and having that pressure relieved. (Id. at 17.)

In fact, Pocahantas Number Three coal, and therefore the Pinnacle product which is a blend of two Pocahantas coals, is a relatively gassy coal. (Id. at 17–18.) There was also evidence that these coals not only emitted a relatively large amount of methane, but also tended to continue to do so for a relatively long period of time after being mined. Such coals are termed "slow desorbing" coals. (Id. at 18.)

Methane is a potentially explosive flammable gas. When coal which emits methane is stored in a closed space, the mixture of methane and air may give rise to an explosive combination. When the methane concentration is between approximately five and fif-

2. There was little structural damage to the vessel. Although this was a massive explosion, the ship was not disabled and completed its voyage after undergoing temporary repairs.

teen percent in a given airspace it is likely to present a risk of explosion. (*Id.* at 25–26; *see also* Bergesen Trial Exhibit 32 (hereinafter "Berg.Ex. # 32".)) Hypothesizing the cause of methane explosions involves complex considerations. As the gas accumulates in a space to a concentration over five percent it will become explosive. If unventilated it will eventually accumulate beyond fifteen percent and there will be insufficient oxygen for explosion. Once past fifteen percent and ventilation of the space is commenced, the methane concentration will become lower again and pass back through the explosive concentration level. (Berry at 27.)

## C. The IMO Code for Safe Carriage of Bulk Cargoes

In the present case, the Pinnacle coal emitted methane gas within the enclosed space of the holds of the BERGE CHARLOTTE. As one can surmise from the preceding discussion, however, some degree of methane desorbtion aboard coal carrying ships is not uncommon. All bulk cargo carriers including the BERGE CHARLOTTE should take some precautions due to the nature of coal cargoes. The parties to this case have charged each other with negligent acts or omissions relating to the type of coal which was carried in the Number Three hold of the BERGE CHARLOTTE. The parties agree that as of October 27, 1990, such ships operated under the 1989 edition of the Code of Safe Practices for Solid Bulk Cargoes as promulgated by the International Maritime Organization (the "IMO Code"). (Berg. Ex. 66 at 10; USS Ans. to Interrog. 9.) Appendix B of the IMO Code (Berg.Ex. 32) listed coal as a bulk material which posed a chemical hazard.[3] In order to distinguish between differing levels of risk associated with coal carriage, the IMO Code established four categories of coal:

CATEGORY A: Coal cargoes of a type that can be identified as having a history of shipment under similar circumstances without problems arising from methane emission or spontaneous heating.

CATEGORY B: Coal that has shown itself liable, or may be liable, to emit methane in quantities sufficient to create a hazard.

CATEGORY C: Coal that has shown itself liable, or may be liable, to spontaneous heating.

CATEGORY D: Coal that has shown itself liable, or may be liable, to emit methane in quantities sufficient to create a hazard and be subject to spontaneous heating.

(Berg.Ex. 32 at 62.) The risks associated with Pocahantas coal were primarily related to its methane emitting characteristics and not spontaneous heating, accordingly this Court is primarily concerned with the distinctions between Category A and Category B coal.

Under the IMO Code, it was the duty of the "shipper or his appointed agent" to designate the category of a given shipment of coal and provide this information to the ship's master. (*Id.* at 17, 62.) It was the duty of the master to "satisfy himself that he has received [the shipper's designated category of the coal] prior to accepting the material." (*Id.* at 62.) In all aspects of cargo handling and ship's operations, it was then the master's duty to observe certain precautions which dealt with the unique risks associated with that particular category of coal. (*Id.*)

Category A Coal:

2. All electrical cables and components situated in cargo spaces and adjacent spaces should be free from defects and safe for use in a methane/dust atmosphere, or positively isolated.

3. Burning, cutting or other sources of ignition should not be allowed in the cargo spaces and adjacent spaces.

4. During loading the master should ensure that the cargo is not stowed adjacent to hot areas.

6. Attention is drawn to the possibility of oxygen depletion in the cargo spaces.

---

3. In addition to the risk of explosion of methane gas, coal also posed a risk of spontaneous combustion and oxygen depletion in cargo spaces. (Berg. Ex. 32 at 62.)

Category B Coal:

. . . .

2. All electrical cables and components situated in cargo spaces and adjacent spaces should be free from defects and safe for use in a methane/dust atmosphere, or positively isolated.

3. Warning notices against smoking and the use of naked flames should be posted in the cargo area. No smoking, burning, cutting, chipping or other sources of ignition should be allowed in the vicinity of cargo spaces or other adjacent spaces.

4. During loading the master should ensure that the material is not stowed adjacent to hot areas.

5. Ensure as far as possible that any gases which may be emitted from the material do not accumulate in adjacent enclosed spaces.

. . . . .

7. Adequate surface ventilation should be provided but on no account be such that air can be directed into the body of the coal as air could promote spontaneous combustion.

8. Ensure that working spaces, e.g. store rooms, carpenter's shop, etc., are regularly monitored for the presence of methane

. . . . .

10. Where for any reason it has not been possible to ventilate prior to removal of hatches or other openings and unloading, care should be taken to vent any accumulated gases.

(*Id.* at 63–64 (emphasis omitted).) The Code further provided that monitoring could be done by using a methanometer, a gas detector or an explosimeter which was suitably calibrated and properly maintained. (*Id.* at 64.) Thus, the IMO Code generally specified greater precautions concerning methane buildup (by ventilating and using methanometers) and limiting ignition sources (by placing greater restrictions on open flames, etc.) when "B coal" was being carried than when "A coal" was carried.

## D. Designation of the Coal Aboard the BERGE CHARLOTTE

■ A central issue in this case is what measures were reasonably necessary to avoid an explosion or spontaneous combustion of the coal cargo. Shippers of coal have a duty to ascertain the nature and characteristics of their cargo and to warn the ship of "foreseeable hazards inherent in the cargo of which the ... [master] could not reasonably have been expected to be aware." *Ente Nazionale Per L'Energia Electtrica v. Baliwag Navigation, Inc.*, 774 F.2d 648, 655 (4th Cir. 1985). Since the question of reasonableness turns in part on the information provided to the parties about the characteristics of the coal being shipped, and the information which the parties were charged with obtaining, the proper designation of the category of coal that was in the Number Three hold is of central importance.[4]

There was some evidence that Captain Pereira had failed to ascertain from the "shipper or his designated agent" the catego-

---

4. Bergesen's claim for indemnity from China Steel rests on a different theory from Boykin's negligence claim against the Steel Defendants, although the analysis ultimately remains the same. Bergesen's claim for indemnity rests on the terms of a charter party, and the question of whether under that agreement China Steel provided sufficient notice to Bergesen of the hazardous characteristics of the cargo. The parties disputed the precise requirements of English law relating to how much information was required under the charter party, and what was the effect of any negligence on Bergesen's part. Bergesen contends that China Steel's duty was one of strict liability, whereas China Steel contends that it needed only alert Bergesen to hazards which Bergesen would not reasonably have foreseen. Ultimately, the Court need not resolve the ques- tion of which party has the better argument regarding the requirements of English law, because even under the defendant's argument, the Court FINDS that the defendants did not provide sufficient information under the terms of the charter party in order to warn Bergesen of the hazardous nature of the cargo.

China Steel contends that "[t]he cargo was fit for ordinary carriage and did not present any hazardous characteristics which were of 'a wholly different kind' from what Bergesen ought reasonably to have anticipated." (Post–Trial Brf. of China Steel at 3.) As will be clear from the discussion below, the Court disagrees. The coal shipped in the Number Three hold should have been designated as Category B coal because it was substantially more hazardous than that which was reasonably anticipated.

ry of the Pinnacle coal prior to its loading at Norfolk. The shipper was USS and its agent for the shipment aboard the BERGE CHARLOTTE was Capes Shipping Company. Lavino Shipping was the agent for both Bergesen and China Steel. Whereas, Captain Pereira did not personally inquire of USS or Capes as to the category of the coal, he did request that Lavino do so and report back to him. This request was made of Todd Eberhard at Lavino on Saturday, October 7, 1990. Though Eberhard was not able to confirm the category on that day, he told Pereira that "to the best of [his] knowledge, through experience, that it was category 'A.'" (Tr. of July 6 at 4–5, Testimony of Todd Eberhard ("Eberhard").) This recollection was later confirmed by Eberhard in communications with Capes.[5] Thus, Pereira had some information that his ship was to be transporting "A" coal.

As the proper procedures to be followed by the master of a vessel transporting coal under the IMO Code flow from the designation given to the coal by the shipper, it is necessary to scrutinize USS's designation of its Pinnacle coal as category "A." Coal should be designated "A" where it may be "identified as having a history of shipment under similar circumstances without problems arising from methane emissions." (Berg. Ex. 32 at 62.) A coal should be designated "B" where it "has shown itself liable, *or may be liable*, to emit methane in quantities sufficient to create a hazard." (*Id.* at 62 (emphasis added).) As discussed previously, Pinnacle coal may fairly be characterized as a relatively "gassy" coal—emitting higher than average amounts of methane. But such a characterization would not, standing alone, determine that such coal should be classified as "B" under the IMO Code. A gassy coal which had a very high desorbtion rate might rid itself of most of its methane in the period of time between when it is mined, processed and transported to a port for loading onto a ship.

Much of the determination of the appropriate categorization under the IMO Code depends on the shipper's knowledge of the properties and past history of the coal. If one looked only at the definition of "A" coal, as Steel has argued, the conclusion might be that only those coals which had experienced accidents (either methane ignition or spontaneous heating) in the past would be placed in a "B," "C" or "D" category. Under this construction, any coal which had a "history of shipment ... without problems" would be "A" coal. Reference to the definition of the higher risk coals ("B," "C" and "D"), however, reveals that the IMO Code contemplated certain coals which had not been involved in prior accidents should not be placed in the "A" category. "B" coal, for instance, would be a coal which had "shown itself to be liable, *or may be liable,* to emit methane in quantities sufficient to create a hazard." A coal which had sustained a methane accident in shipping would have "shown itself to be liable" to present a risk. "May be liable ... to create a hazard" must, therefore, refer to coal which, though it had never actually sustained a methane ignition in shipment, possessed properties which might reasonably give rise to such a risk. Thus, USS's duty in designating the proper category of Pinnacle coal involved an examination of both its shipping history and other known properties in order to properly apprise ship's masters of the risks involved in carriage of that particular coal.

USS may reasonably have believed that there was little risk of a methane explosion in a ship transporting Pinnacle coal based upon its shipping history. It had made three-hundred forty-six Pinnacle coal shipments totalling in excess of eleven million tons over the previous eight years without such an incident. (Tr. of July 7 at 18, Testimony of Clement Kuzma ("Kuzma"); USS Ex. 91.) However, while Pinnacle coal had a safe record in ships, Pinnacle is only a brand

5. The issue of whether Captain Pereira followed applicable IMO Code procedures for ascertaining the category of his coal shipment is not significant in any event. USS agreed that if they had been asked directly by the master on October 7th what category the Pinnacle coal was, they would

have answered that it was "A." (Berg. Ex. 68 at Ans. to Interrog. #7.) Curiously, there is no evidence of any request for category information regarding the Island Creek coal in hatches 2, 4, 6 and 8.

name and the shipper must look to the type of coal, not simply the brand name it attaches to its particular product. There was significant information in USS's possession which would suggest that Pocohantas type coal might desorb gas in the holds of ships in quantities which would create a risk of a methane explosion. Prior to the accident on the BERGE CHARLOTTE, two ships, the M/V NAVIOS CHALLENGER and the MICHELE D'AMATO, had sustained methane gas explosions while carrying coal from the Pocahantas #3 seam—the source of both of the component coals which comprise the blended product branded Pinnacle. (Berry at 109.) The NAVIOS CHALLENGER incident took place in 1981. She was owned by the Navios Corporation which was a subsidiary of USS. Furthermore, USS was aware that methane desorbtion presented risks in its Pinnacle coal. In 1987, a storage silo at USS's Pinnacle plant in West Virginia exploded as a result of a methane ignition. These objective facts coupled with the general knowledge of various managers at USS that Pocahantas #3 coal was "gassy" was sufficient to give rise to the reasonable conclusion that Pinnacle coal from that seam would probably emit dangerous amounts of methane in the holds of a ship.

Furthermore, USS had specific information in its possession in 1989 which, even in the absence of other objective facts, should have led the company to the conclusion that Pinnacle should be categorized as "B" coal. In a March 31, 1989 memo to the Manager of Coal Sales for USS, A.A. Terchick, the technical director of coal and coke warned the sales department about the potential for buildup of dangerous levels of methane in the holds of ships transporting Pinnacle coal. Mr. Terchick was recognized as the most knowledgeable person in the USS organization on the chemical and physical properties of coal. Referring to Pinnacle coal, Mr. Terchick stated that "[w]ith liberation [of methane] continuing for two or three months, it is obvious that ships carrying a gassy coal should have provisions to remove any gas buildup in the hulls." (Berg. Ex. 5 at 1.) [6]

One of the recipients of this memorandum was Allan Holtz, the manager of coal processing. He testified that he would have expected the people in the sales department to pass such information along to ship owners. Ultimately, the memorandum was either ignored or a conscious decision not to act upon Terchick's recommendation was made. Whether or not the specific recommendations for continuous ventilation were relayed to the sales department, such a document coming from the most knowledgeable technical person in the company would at least constitute notice to USS of the potential for dangerous methane buildup. Accordingly, the Pinnacle brand or Pocohantas type coal had, if not "... shown itself to be liable ...", at least "... may be liable, to emit methane ...". For these reasons, the Court FINDS that USS should have designated its Pinnacle coal as IMO Category "B," and its failure to do so was negligent.

Due to the representations made to Captain Pereira that he was carrying "A" coal in the BERGE CHARLOTTE's odd-numbered holds, his duties included conducting the ship's operations under the guidelines set forth in the IMO Code for "A" coal. There is evidence to suggest that Pereira consulted the IMO Code regarding the coal shipment. A number of crew members testified that the master had ordered that there be no smoking on deck. Pereira had assumed command of the BERGE CHARLOTTE from Captain Thomas, a Bergesen superintendent, at Immingham, England a few days before sailing to Norfolk to pick up the USS and Island Creek coal. Thomas testified that while on inspection rounds with Pereira, he specifically drew Pereira's attention to the IMO Code.

The specific actions or lack of action undertaken by Pereira and his crew regarding precautions against methane ignition is the central issue in determining whether Pereira or Bergesen might be chargeable with comparative negligence. In order for this explosion to have taken place, two conditions had to exist. First, the concentration of methane in hold number three (3) had to be between

---

6. The memorandum went on to recommend that some sort of forced air ventilation be employed. This recommendation was disfavored by some

experts with knowledge of coal and shipping due to the risk of spontaneous combustion of some coals when air is forced through the coal pile.

five and fifteen percent, and, second, there had to be a source of ignition. If either condition resulted from negligent acts attributable to either Bergesen or Pereira, then such comparative negligence will serve to offset any liability USS may bear. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975).

## E. Actions Taken Regarding Methane Buildup

The Steel defendants have contended that Plaintiff's decedent Pereira and Cross-claim Plaintiff Bergesen were guilty of comparative negligence, and that any damages owed to those parties must be reduced accordingly. Defendants' argument is based on the premise that Pereira and Bergesen were at least partially responsible, and negligently so, for the build-up of methane in the Number Three hold, and that they were responsible for negligently creating a source of ignition. *See* Section F, *infra.*

■ In maritime tort cases, when more than one party is alleged to be responsible for the incident, liability for damages is allocated among the parties proportionately according to their degree of fault. *Reliable Transfer*, 421 U.S. at 411, 95 S.Ct. at 1715; Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 4-9 (1987). Defendants rely on *Ente Nazionale Per L'Energia Electtrica v. Baliwag Navigation, Inc.* ("KUNIANG"), 774 F.2d 648 (4th Cir.1985), for the proposition that Pereira and Bergesen were under a duty to ventilate the Number Three hold. The methane accumulation in hold Number Three occurred as a result of the desorbtion properties of the Pinnacle coal (a fact which, as discussed previously, USS failed to adequately warn the master of) and insufficient ventilation to prevent that gas from building up to dangerous levels.

The IMO Code provided guidelines as to proper monitoring and/or ventilation of coal cargoes. Arguably, Captain Pereira was operating the BERGE CHARLOTTE under the assumption that, at least as to the coal in the odd-numbered holds, she was carrying "A" coal. The IMO Code specifies no guidelines regarding ventilation or monitoring of "A" coal cargoes. (Berg. Ex. 32 at 63.) For "B" coal, however, the ship's master is advised to provide "adequate surface ventilation" and "ensure as for as possible that any gases which may be emitted from the material do not accumulate in adjacent enclosed spaces." (*Id.*) Thus, there was no duty to ventilate "A" coal cargoes under the IMO Code. But this does not end the inquiry.

■ This Court does not accept the assertion of Plaintiff's expert that "A" coal is so inert that it is akin to having "a cargo hold full of bricks." (Berry at 65.) The IMO Code itself acknowledges that "Coals *may* emit methane." (Berg. Ex. 32 at 62.) Though this statement alone does not suggest that an "A" coal *will* emit methane, evidence adduced at the trial proved that some "A" coals will. Apparently, this fact was not lost on the shipping industry. It was common practice to ventilate "A" coal cargoes at least when weather permitted. When Captain Thomas sailed from Australia to Immingham with a load of "A" coal immediately before Pereira took command, he undertook to ventilate the holds periodically when the sea conditions were such that no significant spray would wet the cargo. In fact, it would appear that Pereira was periodically ventilating on the voyage out of Norfolk. (Tr. of June 9 at 142–43, Testimony of Gurudutt Prabhu ("Prabhu"); Kunhiraman Dep. at 61.) As will be discussed below, there were apparently some efforts undertaken on the morning of the explosion to ventilate. *See infra* Section F. The issue to be settled in this regard is whether the crew of the BERGE CHARLOTTE should have ventilated the Number Three hold more effectively on that day. The weather was fair enough to have allowed them to do so. The last log entry on October 27th prior to the explosion reflected no sprays on deck. But this would have been the first opportunity to ventilate in more than a day. The sea state on October 26th was such that she was "shipping sprays" over the bows all day and as late as 2300 hours. By 0400 on the 27th, the log reported only occasional sprays and the wind force dropping steadily. (USS Ex. 93; Tr. of June 9 at 155–72, Testimony of Easow Thomas ("Thomas").) Beyond this, there are

insufficient facts to conclude whether or not the crew could have ventilated earlier or more efficiently. Therefore, the COURT finds there is insufficient evidence upon which it could base a finding of comparative negligence attributable to Pereira or Bergesen for failing to ventilate the Number Three cargo hold.

## F. Possible Sources of Ignition

■ As noted *supra,* the Steel Defendants have contended that Plaintiff's decedent Pereira and Cross-claim Plaintiff Bergesen were guilty of comparative negligence because they are alleged to have created the source of ignition. Defendants concede, however, that they cannot prove what was the precise source of ignition, although they have offered numerous possible explanations to the Court, each of which they contend would justify a finding of comparative negligence. Defendants' argument is not persuasive, however, because the Court cannot base a finding of comparative negligence upon multiple inferences based upon speculative theories of causation. *See Tug Raven v. Trexler,* 419 F.2d 536, 544–45 (4th Cir.1969), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 271 (1970) (district court's finding of liability reversed on appeal as based on speculative inferences of causation).

It is clear that methane had built up in the Number Three cargo hold on the morning of the explosion. An important question before this Court is what determination can be made as to the source of ignition. Upon the evidence adduced at trial, the Court believes there are three possible sources: (1) a torch or open flame, (2) a static or friction spark, or (3) an electrical spark. All three possibilities relate in some way to the work which was being undertaken on or adjacent to the Number Three hold. Some of the holds, including Number Three, had taken water on the previous voyages. It was reported in a

survey conducted at Immingham while Captain Thomas was still in command that "the compression bars on each of the hatch covers main cross joints [were] heavily scaled [with rust] and the vertical rubber seals . . . gouged." (USS Ex. 66 at 5.) The report went on to state that the chief officer was advised that "attempts should be made to descale and make flush the compression bars." (USS Ex. 66 at 6.) Because seawater damages coking coal, it was necessary to protect the coal from these leaks which had developed at the intersection of the two (2) part hatch covers.

As a temporary repair, ships commonly use a special sealing tape called "Ram–Nek" which is applied to join the seam which is formed at the point where the two halves of the hatch covers meet. This tape is in strips a few feet long and approximately six inches wide. It consists of a plastic tape with a tar-like gummy substance affixed to it and a removable backing strip. The directions for its application call for the user to remove all remnants of previously applied tape leaving only a thin film of the adhesive on the surface;[7] loose rust and paint are to be removed using a wire brush or scraper. When the surface is free of loose particles and dry, the tape is applied by removing the backing strip, applying it to the joint and walking on the now exposed plastic backing to press it into place. (Berg. Ex. 61 (application instructions).)

In addition to the use of Ram–Nek tape on the voyage into Immingham, Pereira had the crew apply it more than once to certain hatches after leaving Norfolk. On the morning of the explosion, Ram–Nek was being applied to the Number Three hatch covers. Able-bodied seaman ("AB") Shamshat Ali had been summoned up onto the hatch only a few minutes before the explosion to assist other crew in pressing the tape into place.[8]

---

**7.** A degreasing solvent could be used to wipe off any remaining layers of film.

**8.** AB Ali appears to be the last surviving person to have observed any of the activities at the Number Three hold. After assisting for a few minutes, he was told to return to his previous task painting the provisions crane aft of the accommodation. Once back at the crane, he was

hundreds of feet from the accident and his view of Number Three was completely blocked.

There was a dispute surrounding the circumstances of the revelation of Ali's testimony. A private investigator from Bombay, India located him only a few days before the trial was to commence. There were some discrepancies in what he claimed to have observed between when he was first interviewed in India and when he

The evidence does not show whether this job was completed when Ali left or was ongoing. If it were ongoing, it is possible that some sort of scraping or chipping, with the possibility of a spark being generated, was being done in an effort to remove loose rust and this could have been the ignition source.[9] There was expert testimony that the ignition source need only provide approximately 0.3 millijoules—or about that amount of energy which is released in a static discharge created by a person walking on a carpeted floor on a dry day.[10] (Mitchell at 77–78.) There was evidence of other possible sources of such small sparks. For instance, AB Ali testified that he saw the Fitter using a hammer down under the Number Three hatch combings. (Ali Dep. at 51–53.)

There is also the possibility that a spark was generated by the friction created by opening one of the metal ventilator covers on the aft access trunk. Hold Number Three on the BERGE CHARLOTTE had two "access trunks"—one fore and one aft. These were relatively tall structures which provided access from the deck into the holds. They were also designed to allow ventilation of the airspace within the hold itself. There was not only a door for crew access on each trunk, but also a window-like opening which allowed air flow when their so-called ventilator covers were opened. These ventilator covers were like shutters on a window. When closed, they were secured ("dogged down") with a series of heavy-duty toggle screws. To ventilate the holds, a crewman would unfasten the toggle screws and swing the cover away, thereby exposing a screened opening. When both fore and aft ventilator covers, and sometimes the access doors, were open, air would circulate down through one trunk, into the hold and back out the other trunk. This had the effect of flushing the dead air space on top of the cargo within the hold. On the BERGE CHARLOTTE it was normally the duty of the Bosun to open the ventilator covers on orders from the Chief Officer or the Master. (Kunhiraman Dep. at 15.)

The physical evidence is consistent with a theory that the Bosun was in the process of opening the ventilators when the explosion occurred. Starting at the bow of the ship, the covers had all been opened on all the ventilator trunks, fore and aft, for holds One and Two. At Number Three, in which the explosion took place, the aft ventilator cover was blown completely off its hinges and the screen was gone. Even though the cover had been ripped from its hinges, the toggle screws were all intact. (USS Ex. 7A; also USS Ex. 7, photo 23.) The fore ventilator cover was largely intact and the screen, though still attached, was nearly blown out of the opening. (USS Ex. 7C; also USS Ex. 7, photo 15.) No other ventilator covers had been opened on the remaining six holds. This physical evidence is consistent with the possibility that the Bosun, having opened vents on holds One and Two, was working his way aft down the ship in the process of ventilating all the holds. Having opened the ventilator cover on the forward access trunk to Number Three, he might have been in the process of unfastening the toggles on the aft trunk. At some point in this process or at the moment that he swung the door back a spark may have been generated which

later gave a *de bene esse* deposition in Norfolk, Virginia. There was also a memorandum sent from USS's Bombay counsel (who had hired the private investigator) to USS counsel in this litigation. The language used in that memorandum was somewhat suggestive that Ali was offering to give favorable testimony in exchange for a job. Upon observing Ali's demeanor in his videotaped deposition, this Court has not wholly discredited his testimony, particularly not those observations he made while assisting at the Number Three hold.

9. There is no reason to believe that any heat would be applied or cutting would be done as part of the use of Ram–Nek tape.

10. Not only have the Steel Defendants failed to prove that any of the suggested sources of ignition were the actual or even the most probable cause, but two of U.S. Steel's experts, Donald W. Mitchell and Captain Wu Yuan, agreed that a spark generated by opening the door or vent cover in order to ventilate the hold could have ignited the methane. (Tr. of July 6 at 77; Testimony of Donald W. Mitchell ("Mitchell"); Tr. of July 7 at 77–78; Testimony of Wu Yuan ("Wu").) Therefore, it is possible that the crew was engaged in the very act that defendants allege they should have been doing in order to be non-negligent, the act of ventilating the hold, but that this was the act which caused the ignition.

caused the explosion. The relatively minor damage to the forward ventilator, because it was open, and major damage to the aft cover, because it was at least partially closed, is consistent with this possibility. Furthermore, the Bosun's body was found on the deck just aft of Number Three and adjacent to the aft Number Three access trunk. (Ali Dep. at 57–59; Wu at 59.) [11] This is not to say that this theory provides a definitive explanation of the source of the ignition.[12]

In any event, the question before this Court is whether, in taking some action which may have provided an ignition source, the crew of the BERGE CHARLOTTE was negligent and contributed to the accident in such a way as to mitigate any liability USS may bear. Upon reference to the IMO Code, none of these possible spark-creating acts would constitute unsafe practices for a ship carrying "A" coal. Where the "B" coal guidelines prohibit "smoking, burning, cutting, chipping ..." and the "A" coal guidelines expressly prohibit only "burning [and] cutting," it would appear to this Court that chipping (and scraping, because it is an analogous activity) would be acceptable practices where a ship is carrying "A" coal.

If, however, some sort of burning or cutting was undertaken in the vicinity of Number Three, it would constitute a negligent act even for "A" coal. The one suggestion of such work arises from the testimony of AB Ali. He testified that before returning to work painting the provisions crane, the Fitter had asked him for help retrieving the oxy-acetylene torch equipment from its storage locker near the accommodation. Ali stated that he brought the equipment to the Number Seven hold and left it there with the Fitter. He did not have any knowledge of what the Fitter did with it after that. (Ali Dep. at 54–55.) One of the jobs of the Fitter on the BERGE CHARLOTTE was to do cutting and welding. (Tr. of July 8 at 29; Testimony of Abhijeed Shrikhande ("Shrikhande").) Had the Fitter brought the torch forward to the Number Three hatch and had it been the ignition source, it is unlikely that the equipment would have been intact after the explosion. Chief Engineer Sarkar testified that the oxy-acetylene equipment stowed on deck was in its locker when he conducted inspection rounds sometime after accident. (Tr. of June 9 at 39; Testimony of Alok Sarkar ("Sarkar"); Shrikhande at 15.) [13] Thus, there is evidence, albeit not a preponderance, that a torch was being used at the time of the explosion.

Further, there was no evidence of any electrical welding taking place on the deck at the time of the explosion. In order to do so, someone in the engineering section would have to switch the transformer box to supply power to the deck welding circuit, and the person doing the welding would have to plug

11. Regarding the issue of whether the crew provided sufficient ventilation, this same physical evidence is consistent with the theory that the crew had simply failed to complete the task of opening the vent covers. It is possible that, having opened only one of the two covers at Number Three, little cross ventilation would occur and thus, insufficient ventilation was the result of improper follow through on the task.

12. There was some suggestion at trial that Pereira might have attempted to repair the seal on the hatch covers by descaling the compression bar. It is unlikely that this work was being done. The compression bar and corresponding seal were on the inside surface at the point that the two hatch covers meet. In order to effect this repair it would be necessary to open the hatches. The hatches on a cargo ship are not generally opened while the ship is at sea due to the risk of shipping large amounts of water. Furthermore, opening the hatches was an involved process requiring large hydraulic motors to lift the covers and roll them back from the center of the ship.

At the time AB Ali was called to assist in the work on Number Three the hatch covers were not only closed, but Ram–Nek tape was being applied that seal. This suggests that those overseeing the work had no intention of opening the hatches and wasting the Ram–Nek. Finally, experts testified that the evidence indicated that the hatch covers were closed and locked at the moment of explosion. (Wu at 24–25; Mitchell at 16–17.)

13. The Court observes that there is a paucity of testimony from surviving crewmembers as to what if any work was being done in the vicinity of the Number Three hold. The Court is mindful of and troubled by the apparent interest crewmembers have in not testifying against shipowners for fear of losing employment opportunities. However, the Court cannot base a finding of comparative negligence on the part of Pereira or Bergesen on this concern in the absence of any solid evidence concerning the actual source of ignition.

welding cables into a box on the deck and string the cables forward along the deck to the work site. The ship's electrician testified that, after the explosion, the transformer was still switched to engine room service and there were no cables on deck. (Prabhu at 135, 184.) Thus, the evidence does not support a conclusion that electrical welding was being undertaken.

Likewise, there is little evidence that there was any electrical power in the circuits in the vicinity of the Number Three hold. The testimonies of the Chief Engineer Sarkar and ship's electrician Prabhu consistently established that, prior to sailing from Norfolk, all the circuits providing power for such things as lights in the access trunks and emergency motors for opening the hatch covers had been isolated at circuit panels in engineering and on the bridge. (Prabhu at 130–35, 167, 185–86; Sarkar at 17–32, 113, 116, 125.) There was one piece of contradictory evidence to these facts. When Mr. Mitchell, who was employed by China Steel to inspect the ship, boarded her at Kao Hsing, he was able to turn the lights in the forward access trunk to the Number Seven hold. If his testimony is accurate, then the absolute assurance as to each and every circuit being isolated as expressed by Sarkar and Prabhu may be less than reliable.

In summary, the facts presented at trial make clear that the explosion was caused by the existence of dangerous levels of methane, but that the source of ignition cannot be ascertained with any degree of probability. Therefore, the Court FINDS that the Steel defendants were negligent in failing to warn of the existence of Category B coal in the Number Three hold, and for misrepresenting that coal as Category A coal. The Court further FINDS that the evidence is insufficient to establish that either Plaintiff's decedent Pereira or Cross-claim Plaintiff Bergesen were comparatively negligent.

### G. Damages

■ Plaintiff Boykin claims damages under the Death on the High Seas Act ("DOHSA"), which provides a cause of action "[w]henever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore . . . of the United States." 46 U.S.C.S.Appx. §§ 761–768 (1987). The measure of recovery under DOHSA is limited to pecuniary damages. 46 U.S.C.S.Appx. § 762 (1987).[14] Pecuniary losses may include loss of support, loss of the services of the deceased, loss of nurture, guidance, care and instruction, loss of inheritance, and funeral expenses if paid by the dependents. Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW, § 7–2 (1987); *see also Sea–Land Serv., Inc. v. Gaudet,* 414 U.S. 573, 584–585, 94 S.Ct. 806, 814–15, 39 L.Ed.2d 9 (1974). Grief and loss of consortium are not recoverable under DOHSA.

■ Boykin has contended that his damages include the loss of Pereira's wages during the remainder of his expected life, and the loss of nurture, guidance, care and instruction Pereira would have provided to his two children, who were aged eight years and less than one year at the time of Pereira's death. In support of his claims, Boykin contends that masters such as Pereira earned $3,300 per working month and averaged ten months of work per year. Boykin further contends that the average master received increases in the amount of four to five percent per year, and that Pereira would have worked an additional eighteen years at a minimum but for the tragic incident aboard the BERGE CHARLOTTE. Pereira was forty-four years old at the time of his death. In sum, Boykin estimates lost earnings "at a minimum" of $1,070,000.00 based on the above calculation.

The Court FINDS that Pereira earned a maximum of $3,090.00 per month at the time of his death, and that he worked an average

14. 46 U.S.C.S.Appx. § 762 provides:
**Amount and apportionment of recovery**—The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought.

of nine months per year. The Court bases its damage calculation on Pereira's actual earnings at the time of his death, and multiplies his annual earnings by twenty-one, based on the evidence that Pereira likely would have worked until he was aged sixty-five. Under this calculation, the Court estimates that the lost earnings of Pereira due to his untimely death were $584,010.00. The Court will reduce this figure by the amount which Pereira would have used for his own consumption. *Tallentire v. Offshore Logistics, Inc.*, 800 F.2d 1390, 1392 (5th Cir.1986). Because there is only scant evidence in the record on this point, the Court will assume that Pereira, as one of four members of his immediate family, would have consumed one-fourth of his earnings. Accordingly, Boykin's award for the lost earnings of Pereira is $438,007.50.[15] The Court apportions the award of lost earnings among Pereira's surviving family as follows: $262,804.50 for Pereira's surviving widow; and $87,601.50 for each of Pereira's two surviving children. *See* 42 U.S.C.S.Appx. § 762 (1987) (recovery shall be apportioned among persons for whose benefit suit is brought in proportion to loss they may severally have suffered by reason of decedent's death); *Consol. Machines, Inc. v. Protein Prods. Corp.*, 428 F.Supp. 209 (M.D.Fla.1976); Schoenbaum, ADMIRALTY AND MARITIME LAW § 7-2.

With regard to loss of nurture, care, and guidance, Boykin also presented testimonial evidence showing that Pereira was a devoted father who tended to spend his earnings on his surviving children, and that he was an exceptional man who provided a great deal of care and guidance for his children. A child's claim for loss of nurture under DOHSA is deemed to be susceptible of having a "... definite practical and financial value and ...

subject to pecuniary estimate." *Moore–McCormack Lines, Inc. v. Richardson*, 295 F.2d 583 (2d Cir.1961), *cert. denied*, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962). Such an award is contingent on the production of evidence showing that the deceased parent was fit to furnish such training, and that training and guidance had actually been rendered. *Solomon v. Warren*, 540 F.2d 777, 788 (5th Cir.1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).[16]

The Court FINDS that there is ample evidence in the record to demonstrate that Pereira provided such support for his children in an exemplary manner and that he was exceptionally fit to furnish this type of support. Therefore, the remaining issue is to establish the pecuniary value of those services for each of his children, mindful that loss of society or loss of consortium are not compensable elements under DOHSA.

In *Brown*, the court estimated the pecuniary value of a father's services to a child at $5,000 per year until the age of eighteen, the date of majority. The court's annual award reflected the court's recognition that the decedent was a fisherman who was frequently absent from his child. In *Solomon*, 540 F.2d at 786, the Fifth Circuit upheld a nurture and guidance award of $12,000 per year for one child. Although Pereira was absent from his children because of his work as a ship's master, he was also permitted to take his children with him on this ship and testimony was presented to the effect that Pereira occasionally did so. The Court therefore deems an award of $12,000 per year to be a just and appropriate sum for each of the children. Therefore, the Court awards a total of $120,000.00 for the child now aged eleven, and $216,000.00 for the child now aged two.[17]

---

**15.** The parties have not submitted any evidence of a discount rate by which to reduce the award to present value, and the Court deems Boykin's contention of an annual four to five percent increase in earnings as too speculative. The Court cannot speculate about future increases in earnings or an appropriate discount rate. Therefore, the Court cannot adjust the award for either inflation or a discount rate.

**16.** The requirement that such services have been actually rendered does not prevent an award for children who are too young to have had the

opportunity to actually receive training and guidance. *See Brown v. United States*, 615 F.Supp. 391, 400 (D.Mass.1985), *appeal dismissed without op.*, 795 F.2d 76 (1st Cir.1986).

**17.** Again, because the parties have submitted no reliable evidence of inflation or an appropriate discount rate, the Court will not reduce the award to present value, nor will the Court increase the award to adjust for the possible increased value of Pereira's services to his children over time.

■ As the Court has herein held that Pereira was not guilty of comparative negligence, the Court does not reduce the award to Boykin on that basis. Thus, the Court FINDS that Defendant U.S. Steel is liable to Plaintiff Boykin in the amount of $774,-007.50.[18]

■ Bergesen has claimed damages to its vessel and related expenses, and has claimed for indemnity from Defendants Steel for sums it has paid as a result of the incident.[19] Tort indemnity under maritime law is appropriate when one party has paid moneys for settlement of claims under the test described by the United States Court of Appeals for the Fourth Circuit in *Vaughn v. Farrell Lines, Inc.*, 937 F.2d 953 (4th Cir.1991). The *Vaughn* court required that: 1) there be an indemnitor-indemnitee relationship; 2) the indemnitee was under some compulsion to satisfy the claim of the original plaintiff; 3) the settlement was reasonable; and 4) that the unlawful action of the indemnitor proximately caused the injury to the original plaintiff. *Id.* at 956–57.

■ The Court FINDS that Bergesen has presented sufficient evidence to warrant indemnity from the Steel Defendants. The indemnitor-indemnitee relationship is established because the Court has found that the Steel Defendants were guilty of active or primary wrongdoing, and that Bergesen has not been proven negligent. *Id.* at 957. The Court has further found that the Steel Defendants' negligence proximately caused the harm for which Bergesen paid in settlement, and FINDS that Bergesen's payments were reasonable. Further, Bergesen tendered its defense to U.S. Steel. (Berg. Ex. 72.) In

addition, with regard to indemnity under the charter party, the Court has previously found that China Steel breached the terms of the charter party by failing to provide adequate notice of the hazardous nature of the cargo.[20] Therefore, the Court FINDS that Bergesen is entitled to indemnification from the Steel Defendants.

Bergesen submits that it has paid $300,000 in death benefits, $540,000 to release Bergesen from tort liability attributable to U.S. Steel, and $13,394.13 for funeral expenses, repatriation, and Norwegian Directorate expenses. It has classified the above as a total of $853,394.13 in P & I losses. The Court FINDS that each of these expenses is a reasonable and appropriate item for indemnification and GRANTS the indemnification award in the amount of $853,394.13.

■ Regarding the direct damages to Bergesen, Bergesen has asked for $546,-770.45 for property damages and related expenses, and $107,341.10 for lost hire. Defendants dispute the loss of hire, and contend that the ship had already scheduled a visit to Singapore and therefore no loss of hire can be attributed to that stay. The Court is persuaded by defendants' contention. Bergesen is not entitled to obtain in damages that which it would have paid even if the accident had never occurred. Further, the parties have submitted no evidence which would permit this Court to find that the vessel was delayed for a longer period in Singapore than was intended before the accident or that the repairs were caused by the explosion as opposed to those surveyed in Immingham. Therefore, the Court FINDS

---

**18.** Due to the complex and closely contested issues of liability present in this case, the Court FINDS that prejudgment interest is not warranted. *See Solomon*, 540 F.2d at 799 (award of prejudgment interest is discretionary with trial court).

**19.** Bergesen's claim for indemnity against USS is based on tort principles, while its claim against China Steel is based on the charter party. Prior to trial, however, USS agreed to take over China Steel's defense and to hold China Steel harmless for any damages for which it is held liable.

**20.** The Court FINDS that China Steel is not entitled to the defense of sovereign immunity

under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332(a), 1391(f), 1441(d), 1602–1611 ("FSIA"). The Court FINDS that China Steel waived any sovereign immunity to which it may have been entitled. *See* 28 U.S.C. § 1605(a)(1) (no sovereign immunity exists when it has been explicitly or impliedly waived). Assuming *arguendo* that China Steel qualifies as a foreign state under the FSIA, the Court FINDS that China Steel has either explicitly or impliedly waived sovereign immunity under the terms of the charter party and the coal purchase agreement, or by engaging in commercial activity carried on in the United States or having an effect in the United States. *See* 28 U.S.C. §§ 1605(a)(1) and (2).

that Bergesen is not entitled to recover for the $26,756.12 in expenses and $53,750.41 claimed for lost hire time spent in Singapore.[21]

The Court otherwise deems Bergesen's prayer for indemnity and damages to be appropriate and justified, and awards $853,394.13 for the indemnity claim, $520,014.33 in direct damages, and $53,590.69 for loss of hire.[22]

### Conclusion

Plaintiff Boykin and Cross-claim Plaintiff Bergesen have met their burden of establishing the negligence of Defendants Steel in incorrectly categorizing the coal in Number Three hold as Category A coal instead of Category B coal, and for failing to warn of the dangerous propensities of that coal. Defendants' negligence was a proximate cause of the explosion which resulted in the death of Plaintiff's decedent Pereira and others, and damage to the vessel and related expenses. Although the Court has been presented with numerous hypothetical scenarios as to how work by the crew may have provided a source of ignition, the Court cannot base a finding of comparative negligence on such speculation. Accordingly, the Court FINDS that the awards to Boykin and Bergesen will not be reduced under a comparative negligence theory.

It is so ORDERED.

---

**21.** The Court declines to reduce the award further in two other respects as requested by the defendants, *viz.*, that the class surveyor did not require a temporary hatch cover to be constructed when the BERGE CHARLOTTE was in Cape Town, and, that the indemnity award should exclude the contractual death benefits required by the decedents' employment agreements. The Court FINDS both items of damages to be appropriate.

**22.** Again, because of the complex and closely contested issues of liability in this case, the Court FINDS that prejudgment interest is not warranted. *See Solomon*, 540 F.2d at 799.